**Affirmed and Opinion filed December 12, 2013.**



In The

# Fourteenth Court of Appeals

NO. 14-12-00683-CV
NO. 14-12-00702-CV

**WASHINGTON SQUARE FINANCIAL, LLC D/B/A IMPERIAL STRUCTURED SETTLEMENTS, Appellant/Cross-Appellee,**

**V.**

**RSL FUNDING, LLC, Appellee/Cross-Appellant**

**On Appeal from the 55th District Court
Harris County
Trial Court Cause No. 2010-49166**

## O P I N I O N

Personal-injury claims are frequently resolved through structured settlements in which the injured party releases his claim in exchange for the right to a stream of payments, often funded through an annuity. Factoring companies offer to pay the claimant a discounted lump sum in exchange for all or a portion of this income stream. To help protect claimants from the potential for overreaching by such

companies, the Texas legislature enacted the Texas Structured Settlement Protection Act ("the Act"), which provides that no transfer of the right to structured-settlement payments shall be effective unless it has been approved in advance in a final court order based on certain express findings. *See* TEX. CIV. PRAC. & REM. CODE § 141.004 (West 2011).

Here, factoring company Washington Square Financial, LLC d/b/a Imperial Structured Settlements ("Imperial") sued rival factoring company RSL Funding, LLC ("RSL") for tortious interference with a transfer agreement that had not yet been approved in a final court order. In the central issue before us, we conclude that because the transfer agreement had not been approved by the court, its enforcement would violate public policy, and thus, the trial court did not err in granting summary judgment against the plaintiff factoring company on its tortious-interference claim.

Although the RSL defeated Imperial's tortious-interference claim, it argues on appeal that the trial court erred in denying its own counterclaim for declaratory judgment and in failing to award it attorney's fees available under the Uniform Declaratory Judgments Act. We conclude that in requesting a declaration that its own transfer agreement was legally enforceable, RSL did not seek affirmative relief but merely raised defenses to the plaintiff's tortious-interference claim. Because the summary judgment eliminating that claim effectively granted RSL all the relief to which it was entitled and the trial court did not abuse its discretion in declining to award attorney's fees, we affirm the judgment of the court below.

## I. FACTUAL AND PROCEDURAL HISTORY

As a result of the settlement of a personal-injury claim, Bryce Hogan agreed to a structured settlement under which an annuity company was to pay him 360 monthly payments of $2,336.00 beginning in February 2008. In July 2010, Hogan

agreed to sell his right to a portion of these payments to Imperial. Hogan and Imperial memorialized the proposed transfer by executing an agreement titled "Absolute Sale and Security Agreement" ("the transfer agreement"). Under the agreement's terms, Imperial agreed to pay Hogan $26,507.25 in exchange for the right to receive 120 payments of $500.00. The transfer agreement was to take effect on the date Hogan signed it "or on such later date prescribed by applicable law." The transfer agreement also provided that Imperial's "obligation to complete this transaction" and to pay Hogan was conditioned upon, among other things, Hogan's receipt of a final, non-appealable court order authorizing the transfer of the payments to Imperial. Under the transfer agreement, Hogan had the right to cancel, "without penalty or further obligation," within the first three business days after the agreement was signed. The parties also agreed that the transfer agreement was governed by and interpreted in accordance with Texas law, and that the agreement incorporated the contents of a disclosure statement required by the Act. To comply with the Act's requirement that any transfer of structured-settlement-payment rights must be approved in advance by court order, Imperial filed the transfer agreement in court along with an application for court approval of the transfer and notice of a hearing.

At some point, Imperial's competitor RSL learned of the agreement by reviewing court records. Brian Heath, a senior account executive of RSL, offered Hogan $3,500.00 more for the same payments that Hogan had agreed to sell to Imperial. Hogan did not immediately accept the offer; instead, he informed Imperial about Heath's visit and forwarded to Imperial the documentation Heath had provided to him. That same day, Imperial sent RSL a letter directing it to cease and desist from tortiously interfering with Imperial's contract with Hogan.

Hogan, however, was still interested in RSL's offer. The week after

3

Imperial sent RSL a cease-and-desist letter, Hogan called Heath to learn more about RSL's offer. After additional discussions, RSL offered Hogan $32,000.00 for the payments—$5,692.75 more than Imperial had offered. Hogan authorized RSL to send a letter notifying Imperial that Hogan no longer wished to sell his structured-settlement payments to Imperial and that he was canceling the transfer. At the same time, Hogan and RSL entered into a sales agreement in which Hogan proposed to sell to RSL the same rights to structured-settlement payments that Hogan had previously proposed to sell to Imperial. According to RSL, Imperial attempted to "bully" Hogan into changing his mind by disparaging RSL and by claiming that Hogan could be held legally liable for canceling his agreement with Imperial. Hogan did not change his mind, however, and the court approved the transfer to RSL on September 13, 2010.

In the meantime, Imperial sued RSL for tortious interference with an existing contract, citing Imperial's transfer agreement with Hogan. Imperial also sought temporary and permanent injunctive relief against RSL from "ongoing and predatory tactics and/or approaching any other of Imperial's customers or soliciting business from them." In an amended petition, Imperial asked the trial court to declare that court approval is a condition precedent to a valid transfer; that a transfer agreement pending court approval is subject to tortious interference; and that no provision under the Act excuses tortious interference.

RSL answered and asserted counterclaims for temporary and permanent injunctive relief to prevent Imperial from interfering with RSL's contract with Hogan, as well as various declarations relating to the respective rights of parties involved in the transfer of structured-settlement rights.[1]

---

[1] RSL also asserted a counterclaim for tortious interference, but later nonsuited that claim.

In the interest of judicial economy, the trial court directed the parties to file cross-motions for summary judgment to address the issue of whether Imperial's transfer agreement with Hogan was the type of contract that could support a tortious-interference cause of action. In response, Imperial filed a motion for partial summary judgment on its tortious-interference and declaratory-judgment claims, and RSL filed a cross-motion for summary judgment on its counterclaims for declaratory relief.

On June 14, 2011, the trial court denied Imperial's motion and granted RSL's cross-motion, effectively agreeing with RSL that Imperial's transfer agreement with Hogan, which had not yet been approved by a court, was not the type of contract that would support a tortious-interference claim. With one exception not relevant to this appeal, all of RSL's requests for declaratory relief that were raised in its live pleading were also included in its motion for summary judgment and impliedly included in the trial court's order granting the motion.[2] The order, however, did not dispose of RSL's requests for injunctive relief or its request for attorney's fees under the Uniform Declaratory Judgments Act ("the UDJA").

After this ruling, RSL filed a motion asking the trial court to render final judgment (a) in accordance with the court's earlier ruling on cross-motions for summary judgment, (b) on RSL's claims for permanent injunctive relief, and (c) on RSL's claim for attorney's fees and costs under the UDJA. The trial court denied

---

[2] In the remaining request for declaratory relief in its live pleading, RSL asked for a declaration "that any statement made about or pertaining to Imperial by RSL and/or its respective agents, servants, employees, attorneys, and other representatives after commencement of this litigation is protected speech, is true and accurate and/or that any such statement does not constitute defamation, slander, or libel." RSL did not seek judgment on this claim, and does not challenge the trial court's failure to grant this relief. We therefore treat this claim as abandoned, as the parties have done.

5

the motion.

Imperial then moved for final summary judgment. In its motion, Imperial acknowledged that the earlier summary-judgment ruling disposed of RSL's claims for declaratory relief, and it asked the trial court to render judgment denying RSL's requests for injunctive relief, attorney's fees, and costs. In response, RSL represented that it sought several declarations that Imperial's agreements with its customers are unenforceable encumbrances under the Act. The declarations described in RSL's summary-judgment response differ from those in RSL's live pleadings and on which the trial court had already ruled.

On June 29, 2012, the trial court granted Imperial's motion and signed a final judgment denying RSL injunctive relief, attorney's fees, and costs. In the judgment, the trial court further stated that with the exception of the declaratory relief that had already been impliedly granted, RSL's requests for declaratory relief addressed matters that RSL lacked standing to raise, or for which no case or controversy was presented, or that were moot. Both parties have appealed.

## II. ISSUES PRESENTED

Imperial appeals the trial court's June 14, 2011 order denying its motion for partial summary judgment and granting RSL's cross-motion for summary judgment on Imperial's claims relating to tortious-interference. In its first issue, Imperial contends that, as a matter of law, transfer agreements subject to the Act can support a claim for tortious interference regardless of whether the agreement has been approved by the court. In its second issue, Imperial argues that the trial court erred in denying Imperial's motion for summary judgment because (a) there is no genuine issue of material fact on the elements of the claim, (b) RSL was not justified in interfering with the agreement, and (c) RSL did not act in good faith under alleged color of law.

6

In two cross-issues, RSL challenges the trial court's June 29, 2012 final judgment denying its request for additional declaratory relief and its request for attorney's fees under the UDJA.

### III. STANDARD OF REVIEW

Declaratory judgments rendered by summary judgment are reviewed under the same standards that govern summary judgments generally. *Wolf Hollow I, L.P. v. El Paso Mktg., L.P.*, No. 14-09-00118-CV, 2013 WL 4188493, at *4 (Tex. App.—Houston [14th Dist.] Aug. 15 2013, pet. filed) (op. on remand) (citing *Hourani v. Katzen*, 305 S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). We review the trial court's grant of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

When we review the rulings on cross-motions for summary judgment, we consider the evidence presented by each party, determine de novo all questions presented, and render the judgment the trial court should have rendered. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (sub. op.); *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 465 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

We also review questions of statutory construction de novo. *Molinet v.*

7

*Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011).  Our purpose in construing a statute is to determine and give effect to the legislature's intent as expressed in the statute's language.  *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 500–01 (Tex. 2010).  We determine legislative intent by reading the statute as a whole rather than by limiting our review to isolated portions.  *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009).

Questions of contract construction are reviewed in much the same way as questions of statutory construction.  As with statutory construction, the construction of an unambiguous contract presents a question of law subject to de novo review.  *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).  Our primary concern in interpreting a contract is to ascertain and to give effect to the intentions of the parties as expressed in the instrument.  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  We examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract, so that none will be rendered meaningless.  *Id.*  We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and will avoid, when possible, an unreasonable, inequitable, or oppressive construction. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).

## IV. IMPERIAL'S APPEAL OF THE
## RULING ON ITS TORTIOUS-INTERFERENCE CLAIM

A party alleging tortious interference must prove that (1) a contract exists that is subject to interference, (2) another person committed a willful and intentional act of interference with the contract, (3) the willful and intentional act was a proximate cause of damage, and (4) actual damage or loss occurred. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.

8

2000); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 664 (Tex. 1990).  In this case, the parties' cross-motions primarily focused on the first element of a tortious-interference claim:  the existence of a contract subject to interference.

On appeal, Imperial contends that the trial court's ruling on the parties' cross-motions was erroneous because under the Act, court approval of a transfer agreement is not a condition precedent to *formation* of a contract, but instead is only a condition precedent to *performance* of the transfer.  Imperial maintains that the transfer agreement's language likewise reflects that the agreement was effective upon execution.  In support of this position, Imperial points to language in the agreement that it characterizes as imposing additional obligations that were effective from the moment the agreement was signed.  These include Hogan's promise "to conduct his affairs" so as to ensure that Imperial obtained the transfer and Hogan's agreement that his failure to do this or to fulfill "any other obligation" under the contract would be a breach of the transfer agreement.  Additionally, the parties agreed on how to account for transfer payments received before the completion of the transfer, and Hogan granted Imperial a power of attorney to act on his behalf.[3]  Consequently, Imperial urges, its transfer agreement with Hogan became a valid and enforceable contract upon its execution, and RSL indisputably interfered with the agreement while court approval was pending.  Imperial further argues that even if the transfer agreement were unenforceable, mere unenforceability is not a defense to an action for tortious interference with the contract's performance.  *See Juliette Fowler Homes, Inc.*, 793 S.W.3d at 664.

In response, RSL argues that, among other things, the transfer agreement

---

[3] We note that each of these alleged obligations are in furtherance of the essential goal of the transfer.

9

never came into existence because court approval is both a contractual and a statutory condition precedent to its formation. Therefore, RSL contends, the transfer agreement was not a contract that could form the basis for a tortious-interference claim. RSL also contends that the Act's requirement that a court determine whether the proposed transfer is in the payee's best interest codifies Texas's public policy of protecting vulnerable annuitants, and RSL accordingly was justified in interfering with Imperial's proposed transfer agreement prior to court approval because obtaining a better price is in Hogan's best interest.[4]

For the reasons explained below, we conclude that, as a matter of public policy, the proposed transfer of structured-settlement-payment rights memorialized in Imperial's transfer agreement with Hogan does not support an action for tortious interference against RSL because the agreement had not been approved by the court.

## A. Absent court approval, the transfer agreement is unenforceable on public-policy grounds.

A state's public policy is embodied in its constitution, statutes, and the decisions of its courts. *Wright v. Sydow*, 173 S.W.3d 534, 551 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Numerous Texas courts have recognized that the Act's purpose is to protect those who have entered into structured settlements of their personal-injury claims from transferring their rights to future

---

[4] On appeal, RSL frames its public-policy argument differently than it did below, arguing that the lack of court approval renders Imperial's transfer agreement "void for illegality." Imperial contends this court may not consider RSL's "new" argument on appeal; however, both below and on appeal RSL has argued that its actions were justified by this state's public policy as codified in the Act. Further, on appeal, RSL relies in part on *Juliette Fowler Homes* for the proposition that contracts that are void, illegal, or against public policy "cannot form the basis of an action for tortious interference." *See* 793 S.W.2d at 664–65. Although RSL's arguments may be imprecise, we conclude that RSL sufficiently raised the public-policy considerations inherent in the Act both below and on appeal. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam) (noting that "appellate courts should reach the merits of an appeal whenever reasonably possible").

periodic payments for a lump-sum payment that is inadequate. *See, e.g.*, *RLS Funding, LLC v. Aegon Structured Settlements, Inc.*, 384 S.W.3d 405, 408 (Tex. App.—Eastland 2012, pet. denied). *See also Transamerica Occidental Life Ins. Co. v. Rapid Settlements, Ltd.*, 284 S.W.3d 385, 391 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (op. on reh'g) (stating that Texas and the other states that have enacted structured-settlement-protection acts did so "to protect unwary tort claimants from potential abuse in their transactions with factoring companies"); *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 729 (Tex. App.—Dallas 2004, no pet.) (noting that the "public purpose and philosophy underlying the statute" is to "protect the recipients of structured settlement payments who are in need of cash from exploitation by factoring companies").

The legislature's public-policy goals are reflected in the Act's substantive and procedural protections for individuals receiving payments under a structured settlement. One such protection is reflected in the legislature's decision that no proposed transfer shall be effective until a court finds that the transfer is in the individual's best interest and approves the transfer in advance in a court order. As relevant here, a "transfer" of such payments is broadly defined as "any sale, assignment, pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights made by a payee for consideration." TEX. CIV. PRAC. & REM. CODE § 141.002(18) (West 2011). A party proposing to acquire the payee's payment rights is required to make certain disclosures at least three days before the date on which the payee signs a transfer agreement. *See id.* § 141.003. The required disclosures include detailed information concerning the terms of the transfer and "a statement that the payee has the right to cancel the transfer agreement, without penalty or further obligation, not later than the third business day after the date the agreement is signed by the payee." *Id.*

11

§ 141.003(8).[5]

Central to the present case is the Act's provision requiring court approval of the transfer of structured-settlement-payment rights:

> No direct or indirect transfer of structured settlement payment rights *shall be effective* . . . unless the transfer has been approved in advance in a final court order based on express findings by the court that:
>
> (1) the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents . . . .

*Id.* § 141.004 (emphasis added).[6]  Thus, before a transfer of structured-settlement-payment rights becomes enforceable, the court must determine that the proposed transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependants.  *Id.*  In addition to the best-interest finding, the court also must expressly find that the payee has been advised in writing to *seek independent professional advice*, and that the transfer does not conflict with any applicable statute or court order.  *Id.* (emphasis added).[7]  An annuity company

---

[5] Although not at issue here, the Act additionally specifies the procedures that must be followed when applying for court approval of a transfer.  *See* TEX. CIV. PRAC. & REM. CODE § 141.006 (West 2011).  It also details the rights and obligations of the parties after a transfer. *Id.* § 141.005.

[6] Imperial argues that the Act's language supports its argument that court approval is a condition precedent to performance, rather than formation, of a transfer agreement, because under the terms of the statute, court approval is required for the "transfer" to be effective rather than for the "transfer agreement" to be effective.  In support of this argument, Imperial stresses that the terms "transfer" and "transfer agreement" are separately defined in the statute.  *Compare id.* § 141.002(18) (defining "transfer") *with id.* § 141.002(19) (defining "transfer agreement"). Conversely, RSL argues that both the Act and the transfer agreement provide that court approval is a condition precedent to formation, citing *In re Rapid Settlements, Ltd.*, 202 S.W.3d 456, 460 (Tex. App.—Beaumont 2006, orig. proceeding [leave denied]) ("The plain language of the Act requires court approval before the agreement is effective and can be enforced.").  Because we resolve Imperial's issue on public-policy grounds, however, we need not address the parties' dispute concerning conditions precedent.

[7] Permitting a factoring company to pursue a tortious-interference claim would blunt the effectiveness of the requirement that the payee must be advised in writing to seek independent professional advice.  A financial advisor would be hesitant to advise the payee to cancel the

cannot redirect periodic payments to any buyer absent court approval. *Id.*

To further ensure that the requirement of court approval is enforced, the legislature provides that "[t]he provisions of this chapter may not be waived by any payee." *Id.* § 141.007(a). Moreover, the Act provides an additional protection for payees when a proposed transfer fails to satisfy the Act's requirements: "A payee who proposes to make a transfer of structured settlement payment rights may not incur any penalty, forfeit any application fee or other payment, or otherwise incur any liability to the proposed transferee or any assignee based on any failure of the transfer to satisfy the conditions of this chapter." *Id.* § 141.007(d).

Thus, the Act reflects the legislature's intent to promote the public policy of protecting payees through numerous substantive and procedural safeguards, chief among these being the express bar to the enforcement of the transfer of structured-settlement-payment rights unless a court first finds that it is in the payee's best interest. Our courts have recognized that legislative public-policy directives may be structured this way. *See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008) (recognizing that some statutes reflect the legislature's decision that public policy requires certain conditions to be met before an agreement may be enforceable). *See, e.g.*, *Office of Attorney Gen. of Tex. v. Scholer*, 403 S.W.3d 859, 866 (Tex. 2013) (noting that "the Family Code requires parents to obtain court approval, conditioned on the child's best interest, before they can enforceably agree to modify child support"); *Byrd v. Woodruff*, 891 S.W.2d 689, 705 (Tex. App.—Dallas 1994, writ dism'd by agreement) (holding that the settlement of a minor's claims must serve the minor's best interest and is not binding on the minor until approved in a final judgment). Accordingly, we conclude that a transfer agreement which has not received the statutorily required

proposed sale if doing so would expose the advisor to liability for tortious interference.

13

court approval is unenforceable on public-policy grounds.

**B.      Because the contract is unenforceable on public-policy grounds, it is not subject to tortious interference.**

Imperial responds that even if the transfer agreement is unenforceable on public-policy grounds, it may still be subject to tortious interference, citing the general rule that unenforceability of a contract is not a defense to an action for tortious interference with its performance. *See Juliette Fowler Homes, Inc.*, 793 S.W.2d at 664 (citing *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex. 1969)). Imperial's reliance on *Juliette Fowler Homes* is misplaced, however, because in that case, the Texas Supreme Court re-examined its application of the general rule in *Clements*, and noted that the contract at issue in that case was "not void or illegal," nor was there "any public policy opposing its performance." *See* 793 S.W.2d at 664–65 (citing *Clements*, 437 S.W.2d at 821). Drawing on this distinction, the court applied a public-policy exception to the general rule by concluding that if a covenant not to compete is an unreasonable restraint of trade and therefore unenforceable on public-policy grounds, the covenant cannot support a tortious-interference claim. *Id.* at 665. We similarly conclude that transfer agreements that have not received the statutorily required court approval are not enforceable on public-policy grounds and therefore cannot form the basis of an action for tortious interference with an existing contract. *See id.*; *see also Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 635 (Tex. 1997) (holding that public policy as expressed in a statute precluded a tortious-interference claim based on an unenforceable contract).

Our conclusion is consistent with the holding of our sister court in *In re Rapid Settlements, Ltd.*, 202 S.W.3d 456, 462 (Tex. App.—Beaumont 2006, orig. proceeding [mand. denied]). There, the court declined to enforce an arbitration

14

clause in a transfer agreement that had not been approved by a court order.[8]  Our conclusion also is consistent with the transfer agreement's express provision that it is effective either when signed "or on such later date prescribed by applicable law."  Under the Act, the date of the final court order approving the transfer is the "later date prescribed by applicable law."

Because we therefore conclude that the trial court did not err in resolving the cross-motions against Imperial, we overrule Imperial's issues.

## V.  RSL'S CROSS-APPEAL OF THE RULING ON ITS DECLARATORY-JUDGMENT CLAIMS

In its cross-appeal, RSL contends that the trial court abused its discretion in denying RSL declaratory relief and attorney's fees under the Uniform Declaratory Judgments Act.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011 (West 2008).[9]  We address these questions separately.

**A.  The trial court did not err in failing to grant RSL's requests for declaratory relief raised for the first time in RSL's summary-judgment response.**

According to RSL, the trial court's first summary-judgment ruling granted RSL's requests for declaratory relief, but the trial court's final judgment effectively reversed that ruling.  We agree that in its first summary-judgment ruling, the trial court granted RSL all of the declaratory relief that it requested in its live pleading, but we disagree that the trial court later reversed that ruling.  It instead appears that the trial court simply refused to grant RSL the additional declaratory relief that it

---

[8] Because we conclude that the transfer agreement is unenforceable on public-policy grounds, our conclusion is consistent with the result reached by the Ninth Court of Appeals, although we do not necessarily agree with that court's conclusion that court approval is a condition precedent to formation of a transfer agreement. *See In re Rapid Settlements, Ltd.*, 202 S.W.3d at 461.  As previously mentioned, we do not reach that question.

[9] RSL does not challenge the denial of its requests for injunctive relief.

15

requested for the first time in its response to Imperial's request for final summary judgment.

In its live pleading, RSL sought declarations that

a.      RSL has a legal right prior to the entry of a final court order of transfer approving another factoring company's agreement to offer to purchase an annuitant's structured settlement payment rights for more money than was offered by Imperial;

b.      It is in the best interest of annuitants to receive and at least be able to consider RSL's offers to purchase structured settlement payment rights for more money and at better interest rates than offered by Imperial or other factoring companies;

c.      RSL had legal justification in contacting Hogan and all other annuitants for the purpose of offering them better terms under which the annuitants may sell their structured settlement payment rights;

d.      Any transfer right, encumbrance on the future payments, or enforceable contract related thereto, with a customer is subject to court approval, and before such court approval the factoring company can have no enforceable right related to the contract;

e.      RSL is entitled, by way of example, to receive the assigned payments from Bryce Hogan, and other customers wishing to sell their future payments, subject to court approval of RSL's application for approval of a transfer of structured settlement payment rights, and that Imperial has no right, title, or interest in a customer's assigned payments until a transfer order has been entered by a court; and

f.      . . . Imperial cannot claim or assert any right, title, or interest in and to the assigned payments that may be the subject of another factoring company's contract by threatening to sue such customer, whether or not the former contract with the other factoring company and state law allow the contract to be canceled without penalty.

In its motion for summary judgment on Imperial's tortious-interference claim, RSL requested summary judgment on these requests for declaratory relief. The trial court granted RSL's motion on June 14, 2011, effectively granting each of these requests for declaratory relief.

16

Imperial then moved for final summary judgment on RSL's "remaining claims" for (1) tortious interference, (2) permanent injunctive relief, and (3) attorney's fees and costs pursuant to the UDJA. At that time, RSL's "remaining claims" did not include any further requests for declaratory judgment, because as Imperial acknowledged in its motion, the trial court's earlier summary-judgment ruling encompassed RSL's claims for declaratory relief.[10] RSL nonsuited its claim for tortious interference, and does not appeal the trial court's failure to grant injunctive relief; thus, the only matter raised in Imperial's motion for final summary judgment that is before this court is its request that the trial court deny RSL's claim for attorney's fees and costs under the UDJA.

RSL's summary-judgment response, however, interjected additional claims for declaratory relief. In its response and in an attached exhibit, RSL represented that in its live pleading, it sought additional declarations that

- Imperial's Security Agreement is an impermissible encumbrance under the [Act] without court approval;

- . . . Imperial's powers of attorney are prohibited encumbrances under the [Act] prior to court approval;

- . . . Imperial's holding of payments for annuitants like Hogan in an escrow account is an improper encumbrance under the [Act] that is unenforceable without prior court approval; . . .

- . . . Imperial's security agreements are unenforceable encumbrances under the [Act] without court approval[;]

- . . . under the [Act], there can be no encumbrance on payments until there is a prior court order of transfer with the result that

---

[10] On appeal, Imperial attempts to qualify this concession, stating that RSL requested declaratory judgment "as to Hogan" and that the trial court's order "did not dispose of RSL's claim for . . . broader non-Hogan declarations." This not supported by the record. Neither RSL's summary-judgment motion nor the trial court's order granting it were confined to "non-Hogan declarations." RSL sought, and the trial court granted, summary judgment as to all of the declarations RSL requested in its live pleading.

17

the customer is free to continue to inquire and learn about his/her best interests[;]

- . . . Imperial's security interest in future payments is an encumbrance on future payments under the [Act], which is not enforceable until prior approval by a court[;]

- . . . Imperial's proposed "contract," the so-called "Absolute Sale and Security Agreement," is an encumbrance on future payments that is unenforceable under the [Act] until approved by a court[;]

- . . . the irrevocable powers of attorney granted to Imperial are encumbrances on future payments and are unenforceable under the [Act] until court approved[;]

- . . . Imperial's practice of holding a portion of the purchase price for the transferred payments in escrow which is not disclosed to the annuitant on the disclosure statement, is an encumbrance and is unenforceable under the [Act] absent prior court approval[; and]

- . . . Imperial's servicing agreements which are not disclosed to annuitants in disclosure statements are invalid and unenforceable and violate the [Act], and require proper disclosure and prior court approval.

In reality, these requests were not sought in RSL's live pleading as it represented to the trial court; however, Imperial did not preserve an objection to the requests on that basis. Consequently, the trial court's final judgment addressed not only RSL's request for attorney's fees and costs, but also "RSL's remaining claims . . . for declaratory relief relating to whether [Imperial's] contract with its customer violates [the Act]." This language in the final judgment refers to the newly asserted requests for declaratory judgment raised in RSL's summary-judgment response; because the trial court already had ruled on the requests for declaratory relief raised in RSL's live pleading, the requests raised in RSL's summary-judgment response were the only "remaining claims" for declaratory relief.

In the final judgment, the trial court wrote in relevant part as follows:

18

Those declarations sought by RSL, *which are not addressed below, are encompassed and implied in the granting of RSL's summary judgment against* [*Imperial's*] *claim.* On the sought[-]after declarations addressed below, RSL did not prevail and is not entitled to fees.

RSL lacks standing to seek declaratory relief as to whether [Imperial's] contract with its customer violates [the Act]. Further, no case or controversy is presented which would allow the Court to issue declaratory relief. Having already ruled that the subject contract is not one which may be the subject of an interference with contractual relations cause of action, declaring the rights of the parties to that agreement is now moot.

(emphasis added).

The declarations addressed in the first of these two paragraphs are those that were implied in the trial court's earlier order granting RSL's summary-judgment motion. In that motion, RSL sought summary judgment on *all* of the declarations that it requested in its live pleading. Because RSL prevailed on that motion, the declarations addressed in the second paragraph—that is, those on which "RSL did not prevail"—must be the requests for declaratory relief raised in RSL's summary-judgment response, on which the trial court had not yet ruled. It therefore appears that RSL's appellate assertion that the trial court effectively reversed its earlier ruling granting declaratory relief is based on a misunderstanding of the trial court's final judgment.

We further conclude that the trial court did not err in failing to rule on the additional requests. Under the UDJA,

A person interested under a . . . written contract . . . or whose rights, status, or other legal relations are affected by a statute, . . . [or] contract . . . may have determined any question of construction or validity arising under the instrument, statute, . . . [or] contract . . . and obtain a declaration of rights, status, or other legal relations thereunder.

19

*Id.* § 37.004(a). To raise a claim for affirmative relief, "'a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation or relief, even though the plaintiff may abandon his cause of action or fail to establish it.'" *BHP Petroleum Co.*, 800 S.W.2d at 841 (quoting *Gen. Land Office of State of Tex. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 570 (Tex. 1990)).

Here, however, RSL's purported counterclaims—that is, the additional requests for declarations in RSL's summary-judgment response—fail to state a claim for affirmative relief in the form of benefits, compensation, or relief that would inure to it even if Imperial were to abandon or fail to establish its cause of action. Instead, RSL sought declarations implicating the rights of two parties to a contract as between themselves. RSL does not contend that it was ever a party to this or any other transfer agreement with Imperial, or that it was an intended third-party beneficiary of such a contract. Moreover, it is undisputed that Hogan canceled his agreements with Imperial and that a court approved his contract with RSL; thus, RSL sought purely advisory declarations on matters about which there was no live controversy. *See Cal. Prods. Inc. v. Puretex Lemon Juice, Inc.*, 160 Tex. 586, 589, 334 S.W.2d 780, 781 (1960) (holding that plaintiff was not entitled to a declaratory judgment that its plan to sell juice in a certain container would not violate a permanent injunction against using a bottle like the defendant's, and explaining that the UDJA "'does not license litigants to fish in judicial ponds for legal advice'" (quoting Anderson, Declaratory Judgments, 2d Ed. Vol. 1, p. 47)). We accordingly overrule RSL's first cross-issue, and hold that the trial court did not err in failing to make the declarations that RSL requested in its summary-judgment response.

20

**B.    The trial court did not clearly abuse its discretion in failing to award RSL attorney's fees under the UDJA.**

In any declaratory-judgment action, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. The trial court may conclude that it would not be equitable and just to award even reasonable and necessary attorney's fees. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). We will not reverse the trial court's judgment on the issue of attorney's fees absent a clear showing of abuse of discretion. *Hoggett v. Brown*, 971 S.W.2d 472, 494 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (citing *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985)).

Imperial moved for final summary judgment on RSL's attorney's-fee claim on two grounds. First, it argued that, as a matter of law, RSL is not entitled to attorney's fees because the counterclaims raised in its pleading presented no new controversies independent of the tortious-interference claims. According to Imperial, RSL simply couched its defenses to Imperial's claim as requests for declaratory relief in order to pave the way for an award of attorney's fees. Second, it argued in the alternative that the trial court should exercise its discretion to deny fees and costs to RSL because Imperial's tortious-interference claim dealt with "an unsettled question of law in this district." The trial court granted summary judgment, stating in the final judgment that "RSL is not entitled to attorneys' fees" because "[i]ts counterclaim was simply the defensive side of [Imperial's] own claim."

RSL contends that the trial court's denial of its request for attorney's fees was an abuse of discretion because the trial court misapplied the "mirror-image" rule and failed to apply the "greater ramifications test. In addition, RSL contends that "[s]ummary judgment should never decide *discretionary* issues."

***1.  RSL has not shown that the trial court clearly abused its discretion by denying its request for attorney's fees.***

In arguing that the trial court abused its discretion in refusing to award RSL attorney's fees, RSL discusses the "mirror-image" rule and the "greater ramifications" test.  This refers to the previously mentioned principle that a defendant is not entitled to recover attorney's fees under the UDJA simply because it styles its defenses to a pending claim as a separate declaratory-judgment action, but that a declaratory action is appropriate if the declaration sought has greater ramifications than the success or failure of the already-pending dispute.  *See BHP Petroleum Co.*, 800 S.W.2d at 841; *Guniganti*, 346 S.W.3d at 251.

We conclude, however, that RSL has not shown that the trial court clearly abused its discretion by denying its request.  The primary request for declaratory relief in RSL's pleading—that is, its request for a declaration that a factoring company has no enforceable rights arising from a contract that has not yet been approved by a court—merely reflects the premise on which Imperial's tortious-interference claim was based.[11]  Its remaining requests for declaratory relief either simply restated that premise or addressed the consequences that flowed from it.

RSL points out several cases in which courts—including this court—have held that when a plaintiff brings a claim for declaratory relief, the mirror-image rule does not prevent a trial court from awarding attorney's fees to a defendant that asks the court to make a corresponding contrary declaration.  *See, e.g.*, *Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist. ex rel. Bd. of Directors*, 198 S.W.3d 300, 318 (Tex. App.—Texarkana 2006, pet. denied) ("Once a plaintiff claims relief under the Declaratory Judgments Act, the mirror-image rule does not prohibit the trial court from awarding attorney's fees even if the defendant's

---

[11] This was request (d) in RSL's live pleading.

22

counterclaim for declaratory relief only duplicates the claims already raised."); *Elder v. Bro*, 809 S.W.2d 799, 801 (Tex. App.—Houston [14th Dist.] 1991, writ denied) ("In a suit where the plaintiff seeks a declaratory judgment, a counterclaim for declaratory relief is available to settle the dispute which was brought in the original action."); *Hawkins v. Tex. Oil & Gas Corp.*, 724 S.W.2d 878, 891 (Tex. App.—Waco 1987, writ ref'd n.r.e.) (rejecting the position "that only one party in a suit can receive attorney's fees in connection with a declaratory judgment and that is the party who first requests it").  This is because the UDJA authorizes the trial court to determine that it is equitable and just to award attorney's fees to *either* party, so a defendant that raises a mirror-image counterclaim in response to the plaintiff's declaratory-judgment claim cannot be said to have raised the counterclaim solely to pave the way for an award of otherwise-impermissible attorney's fees. *See Save Our Springs Alliance, Inc.*, 198 S.W.3d at 318.

The facts in the case before us, however, are distinguishable from those presented in the cases on which RSL relies.  Here, RSL raised all of the declaratory-judgment counterclaims in its pleading in response to Imperial's tortious-interference claim, not in response to a request for declaratory relief.  To the contrary, Imperial never sought declaratory relief until long after RSL did, and even then, Imperial only sought declarations accepting the premises on which its tortious-interference claim was based.[12]  These requested declarations, like those raised in RSL's pleading, had no greater ramifications than Imperial's tortious-interference claim did.  The trial court accordingly awarded no attorney's fees to either party, and none of the authorities cited by RSL support its position that this

---

[12] Specifically, Imperial sought declarations that "under the Act, court approval is a condition precedent to a valid transfer;" that "a transfer agreement pending court approval under the Act is subject to tortious interference;" and that "there is no provision under the Act that excuses tortious interference."

23

result was a clear abuse of discretion.

> **2.** ***The trial court did not err in granting summary judgment on a matter committed to its discretion.***

Finally, RSL's assertion that matters committed to the trial court's discretion should never be resolved through summary judgment is without merit. This argument is contrary to the position that RSL espoused in the trial court, where it moved for summary judgment on its claim for attorney's fees under the UDJA. More importantly, however, this argument is simply incorrect: equitable matters that are committed to a trial court's discretion can be addressed through summary judgment. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 429 (Tex. 2008) (holding in an equitable action for reimbursement that "[b]ased on the summary[-]judgment record here, it appears that the trial court *abused its discretion* in refusing reimbursement of drilling costs") (emphasis added).

We overrule RSL's second cross-issue.

## VI. CONCLUSION

Having overruled each of the issues presented, we affirm the trial court's judgment.

/s/     Tracy Christopher
        Justice

Panel consists of Justices Christopher and Donovan. (Former Justice Jeff Brown not participating.)