NO. 07-07-0073-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

OCTOBER 16, 2008
_____

GOLDEN SPREAD ELECTRIC COOPERATIVE, INC.,

Appellant

v.

DENVER CITY ENERGY ASSOCIATES, L.P.,

Appellee
_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 91016-E; HON. ABE LOPEZ, PRESIDING
_____

*Opinion*
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.


"When you're winning, you make it easy, when you're losing you make it hard, when you don't know, you give it to the judge, that's what lawyers do."[1]


With this appeal, the court delves into the field of supplying electrical energy, a field strewn with such concepts and terms as "PPA capacity," "requested energy," "replacement

_____

[1]Jackie Paul.

energy," "power factor of 0.9 lagging to .095 leading," "spinning reserves," "conversion outage hours taken," "matrices and formulas," "heat rates" with accompanying formulas, "Total Augmented Capacity," "fixed capacity degradation value," "simple cycle," "combined cycle," and other verbiage seldom encountered in the writings of Dickens, Shakespeare, Prosser, or Corbin. Yet, it is the interpretation of such terms that underlies the controversy before us. Moreover, they and others appear in a contract between Golden Spread Electric Cooperative, Inc. (Golden) and Denver City Energy Associates, L.P. (Denver) under which the latter agreed to supply electrical energy to the former. The parties filed cross-motions for summary judgment, which motions resulted in the trial court entering judgment in favor of Denver City.[2] Six issues now await consideration, and upon addressing them as needed, we affirm the judgment in part and reverse it in part.

*Spinning Reserves and Their Supply*

Golden initially contends that the trial court erred in granting Denver's no-evidence motion for summary judgment on the question of "spinning reserves." Allegedly, Golden presented some evidence illustrating that Denver failed to fulfill its obligation to provide them, and we agree.

"Spinning reserves" are not a condition one encounters after reading the appellate record and briefs at bar, though both could cause minds to spin. Rather, according to Golden, they represent electrical capacity immediately available to respond to an increase in load relative to the generation available to serve load – such as occurs when a power plant experiences a sudden forced outage. Furthermore, without such reserves, the

---

[2]The motions were for partial summary judgment but the trial court severed the remaining causes of action and later disposed of issues regarding attorney's fees and prejudgment interest.

sudden loss of a large power plant on an interconnected electrical system can cause widespread blackouts, it continued. See *Centerpoint Energy Houston Elec., LLC v. PUC* 212 S.W.3d 389, 396 n.6 (Tex. App.–Austin 2006, judgm't vacated w.r.m.) (describing "spinning reserves" as a utility company's maintenance requirement imposed by the Energy Reliability Council of Texas (ERCOT) or a like body which requirement obligates the utility to maintain a reserve of generating electrical capacity that can be used in the event of a system disturbance or disruption). Here, Golden alleged, via its "Seventh Amended Petition and Amended Answer to Defendant's Counterclaim" that Denver failed to comply with its contractual duty to provide such reserves.

The duty in question is found in article five of the purchase agreement (PPA) executed by the parties, which article is entitled "Purchase and Delivery; Dispatch." The article begins by describing the agreement of Denver to "deliver and sell" to Golden and Golden's duty to "accept and purchase" the "PPA Capacity . . . and the Requested Energy." Then, the parties state that the "Seller [Denver] agrees, at no additional cost to Buyer [Golden], to provide spinning reserves for the PPA Capacity as required to meet applicable requirements for such reserves." Golden interprets this provision to mean that Denver obligated itself to provide spinning reserves free of charge. Denver, however, reads it as an obligation to provide reserves "only if Golden Spread is ever required to meet applicable spinning reserve requirements and will otherwise incur additional cost to do so." Whose interpretation is correct depends upon application of contractual rules of construction.

Construing an unambiguous contract involves a question of law. *In re Waggoner Estate*, 163 S.W.3d 161, 165 (Tex. App.–Amarillo 2005, no pet.). Thus, the standard of review is *de novo*, and we are not bound by the interpretation afforded the document by

3

the trial court.  *MCI Telecommunications Corp. v. Tex. Utilities Elec. Co.,* 995 S.W.2d 647, 650-51 (Tex. 1999).  But, like the trial court's, our burden is to discover and effectuate the intent of the parties.  *Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d 24, 26 (Tex. App. –Amarillo 2000, no pet.).  Additionally, that intent must be garnered from the language of the contract itself, which language is considered in its entirety.  *Id.*  In other words, we review the complete document to understand, harmonize, and effectuate all of its provisions.  *Id.*; *Questa Energy Corp. v. Vantage Point Energy, Inc.,* 887 S.W.2d 217, 221 (Tex. App.–Amarillo 1994, writ denied).  Authority also binds us to afford the words contained in the agreement their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise.  *Sun Operating Ltd. Partnership v. Holt,* 984 S.W.2d 277, 285 (Tex. App.–Amarillo 1998, pet. denied); *Phillips Petroleum Co., v. Gillman,* 593 S.W.2d 152, 154 (Tex. Civ. App.–Amarillo 1980, writ ref'd n.r.e.).  And, most importantly, we may not rewrite the agreement to mean something it does not.  *Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d at 26; *Borders v. KRLB, Inc.,* 727 S.W.2d 357, 359 (Tex. App.– Amarillo 1987, writ ref'd n.r.e.).  With this said, it is time to address the provision at issue.

First, we note that the language dealing with spinning reserves appears in a part of the contract that establishes the quantum of electricity Denver is to generate and sell and Golden is to buy.  And, after the extent of the initial obligation is described, the parties address the matter of spinning reserves.  Next, we note that the plain meaning of the word "reserve" contemplates the existence of a resource that goes unused in normal situations but nonetheless remains available for times of need.  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1059 (11th ed. 2003).  This interpretation comports with what was previously

4

alluded to as a spinning reserve, that is, it is a backup source of electricity available for use in the event of a system disturbance or disruption. And, it was this backup resource that Denver agreed "to provide" at "no additional cost to" Golden.

Next, the promise to provide the reserve is not without limitations. The limitation most obvious is inherent in the phrase "as required to meet applicable requirements for such reserves." That passage restricts the extent of Denver's responsibility to the generation of those reserves needed to satisfy "applicable requirements" imposed on Golden. In other words, the duty imposed on Denver equaled the duty imposed on Golden; for instance, if the latter was required to maintain spinning reserves equal to one kilowatt of electricity, then Denver would be required to have in reserve only one kilowatt of electricity. Moreover, if the phrase "at no additional cost to Buyer" is to have any meaning, it can only be reasonably read as illustrating Denver's agreement to make the one kilowatt of electricity available when needed at its own expense. So, in short, we read paragraph 5.1(C) as saying that if Golden is required to maintain spinning reserves, Denver will provide them without charge but only to the extent of Golden's obligation.

Now, the trial court read the same paragraph as requiring Golden to first pay for spinning reserves and then allocate any duty it has to maintain them among the other entities from which it can acquire electricity. That construction runs afoul of ours. It effectively converts Denver's promise from one of initial and ongoing action to one of indemnity. That is, it frees Denver of creating or maintaining the reserves in case Golden needs them. Instead, its obligation simply becomes one of reimbursing Golden for the cost incurred in having to find and dip into a reserve created by some other generating facility. While some may see little difference between the two interpretations, that of the trial court

5

negates the bargain Golden sought in being assured that the requisite reserves would not only be available but also be available from one particular and certain source.

Also, we find missing from paragraph 5.1(C) verbiage which obligates Golden to allocate any requirement it may have to maintain spinning reserves among multiple generating facilities. Again, via that paragraph, Denver and no one else, expressly agreed "to provide spinning reserves for the PPA Capacity . . ." to the extent that Golden is "required to meet applicable requirements for such reserves." And, because nothing in the provision directs Golden to allocate its needs among multiple sources, we opt not to read such an obligation into it. Again, the language in the paragraph is the unambiguous language selected by the parties; so we cannot alter it.

Finally, the record contains the affidavit of a Golden officer wherein he avers that Denver never provided Golden spinning reserves. Instead, Golden had to generate its own to meet applicable requirements imposed on it, he continued. If believed, this constitutes some evidence of Denver's failure to abide by the promise it made in paragraph 5.1(C). Thus, the trial court erred in concluding that there was no evidence of breach, and we sustain the point.

*Who Can Commit or Request Electricity*

Golden next finds error in the trial court's declaration that Southwestern Public Service (SPS) had the sole right to commit and dispatch electricity from Mustang Station. We disagree and overrule the complaint.

Paragraph 5.2 of the PPA states that "Buyer's dispatcher . . . *shall have the sole discretion* to commit[,] schedule and dispatch the PPA Capacity." (Emphasis added). Moreover, Golden and SPS executed a document entitled "Commitment and Dispatch

6

Service Agreement." Therein, Golden requested SPS "to provide the commitment and dispatch service to Golden Spread for Mustang Station." In response, SPS stated that it "is willing to provide this service under the terms of" the Commitment and Dispatch Service Agreement. Per the latter agreement, the term "commitment" means "a process which involves determining which available generating units are required to meet the forecasted Requirements for the next day, while also taking into account all relevant constraints." "Dispatch" means "an automated process which utilizes the lowest cost energy available from the committed resources to meet the continuously changing demand, while also taking into account all relevant constraints."

Upon combining the plain meaning of paragraph 5.2 with the terms of the Golden/SPS commitment and dispatch contract, we conclude that Golden effectively vested SPS with "sole discretion" to request energy under the PPA. That Denver may not be a party to the Golden/SPS accord is of no consequence since the privilege to delegate was that of Golden Spread, not Denver's.

To the extent that Golden questions the trial court's finding that "SPS . . . has the sole right to commit and dispatch Mustang Station . . . . [and] [i]f SPS fails to commit or dispatch the Project during a time of unexcused outage, there is no Requested Energy and therefore no Replacement Energy obligation on the part of [Denver City]," we reject it as well. Again, SPS was given the sole discretion to commit, dispatch, and schedule energy. Golden cannot ignore this delegation of authority even if SPS chose not to request electricity from the generating facility. In other words, it must abide by its agreement.

7

*Applicable Heat Rate*

Next, Golden questions the trial court's finding that Denver could charge Golden via a formula applicable to the generation of energy through "simple cycle" when it operated Mustang Station in the "simple cycle" mode though the facility was equipped, at the time, to operate in combined cycle.[3] Allegedly, Denver was required to use combined cycle heat rates when determining the sums due when the failure to operate in combined cycle was unexcused. We disagree and overrule the issue.

As previously mentioned, the intent of the parties usually is determined by looking at the entire agreement. But, this is not true if a particular provision expressly addresses the matter. This is so because the specific controls the general. *Ayres Welding Co., Inc. v. Conoco, Inc.,* 243 S.W.3d 177, 181 (Tex. App.–Houston [14th Dist.] 2007, pet. denied). And, such a provision exists here.

The parties entitled Appendix 2, §5 of the PPA, "PPA Heat Rate During Combined Cycle Commercial Operations Period." Therein, they agreed that:

> When the Project is operating in simple cycle mode, the PPA Heat Rate for each hour or portion thereof shall be determined in accordance with Section 4 of this Appendix. When the Project is operating in combined cycle mode, the PPA Heat Rate for each hour or portion thereof during the Combined Cycle Commercial Operations Period shall be determined through the following steps.

As can be seen, the provision draws a distinction between heat rates when the facility is operating in simple versus combined cycle mode. So too does it designate the formulas to

---

[3]The heat rate is an element of the formula used to determine the payment due from Golden to Denver for electric energy. Additionally, the term "simple cycle" connotes the generation of electricity via two combustion generators. In contrast, the term "combined cycle" connotes the generation of electricity through the use of both the combustion generators and a steam operated generator. The steam used to operate the latter generator is a byproduct derived through the operation of the combustion generators.

be used in deriving the heat rate when the facility operates in one mode or the other. Moreover, nothing in the clause restricts the calculations to situations involving force majeure or like reasons for operating in simple cycle as opposed to combined cycle mode. Nor does §4 of the same appendix so restrict the calculation.

Also of note is the title assigned to the section. The language adopted, that is, "PPA Heat Rate *During Combined Cycle Commercial Operations Period,*" indicates that the parties both understood and intended that they were generally discussing the manner of determining heat rates after Mustang Station became capable of operating in combined cycle mode. (Emphasis added). This, combined with the expressed language of §5 leads us to conclude that it did not matter to the parties why the facility was operating in single cycle mode after it was capable of operating in combined cycle. If it was operating in simple cycle, then the heat rate was to "be determined in accordance with Section 4 of this Appendix."

We must be cautious in implying a term missing from a writing. *Universal Health Servs., Inc., v. Renaissance Women's Group, P.A.,* 121 S.W.3d 742, 747 (Tex. 2003) (stating that a court should be cautious in implying a covenant to reflect the parties' intent). We heed the caution and conclude that the trial court correctly interpreted the provision.

*Mitigation by Golden*

Golden next questions the trial court's finding that it breached its duty to mitigate the potential damages suffered or expenses incurred by Denver while meeting the electrical demands of Golden. This issue apparently relates to the sale of electricity for which Denver billed Golden during the time Denver was operating in simple cycle due to purportedly unexcused outages. According to Golden, the bill should have reflected rates applicable to operating in combined cycle. Both Denver and the trial court believed that the rates were

9

to be determined via the formula applicable to operating in simple cycle mode (which rates were higher). Given our holding above that Denver was entitled to charge simple cycle rates when running in simple cycle, we consider this issue moot and overrule it.[4]

*Prejudgment Interest*

Next, Golden questions the manner in which the trial court calculated prejudgment interest. The trial court found that the parties had reached an agreement on the matter, which they had. However, the methodology agreed to was misapplied by the court, according to Golden. We agree but for different reasons than those uttered by Golden.

The record discloses that the parties entered into a Rule 11 agreement wherein they stated that any "award of damages" or any "damage award" would "bear interest at the Base Rate as (defined in the PPA) +2% on the last day of the banking month, compounded monthly." The Base Rate, as defined in the PPA, means "the base or prime lending rate set from time to time by The Chase Manhattan Bank, or its successor." Golden interprets these two provisions as requiring that *prejudgment* interest be calculated by determining what the Chase Manhattan prime rate was at the end of each month during which the debt remained unpaid, adding two percent to it, and then multiplying the sum by the amount of debt to derive that month's interest. In effect, the rate could vary each month in unison with

_____

[4]Within this issue, Golden also argues that some of the trial court's declarations were overly broad. The declarations in question pertained to the statements that 1) Denver "correctly billed Golden . . . for such energy [*i.e.* energy produced and sold while operating in simple cycle due to the outage] based upon Paragraph 4 of Appendix 2, utilizing simply cycle heat rates" and 2) Denver "correctly invoiced Golden . . . for all energy produced by the Project . . . ." These findings, according to Golden, were too broad since they could be read as encompassing claims unrelated to those averred in Denver's pleadings. We disagree because it was those pleadings that framed the scope of redress which the trial court could award, and the findings can and must be read as only addressing the claims in those pleadings. *See* TEX. R. CIV. P. 301 (restricting the trial court's ability to grant more relief than that sought in the pleadings). Thus, they are limited to Denver's demand for payment for the energy sold to Golden while Denver operated in simple cycle mode during February of 2001.

10

variations of the Chase Manhattan prime rate. On the other hand, Denver contends that *prejudgment* interest was to be determined by taking the Chase prime rate existent at the end of the month in which the debt first became due, adding two percent to it, and then using that sum to multiply against the outstanding debt each month. Under Denver's methodology, the interest rate would remain constant. However, neither interpretation of the Rule 11 agreement is correct. We so conclude because the formula specified in that accord pertained to post-judgment, as opposed to prejudgment, interest.

Rule 11 agreements are little more than contracts relating to litigation. *See Disney v. Gollan,* 233 S.W.3d 591, 595 (Tex. App.–Dallas 2007, no pet.). As such, they are to be interpreted in the same manner as are contracts in general. *Dallas County v. Rischon Development Corp.,* 242 S.W.3d 90, 93 (Tex. App.–Dallas 2007, pet. denied). Thus, we look to the plain meaning of the words used to determine the extent of the parties' agreement. *Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d at 26.

Here, it is rather clear that the parties intended to describe a particular interest rate through the Rule 11 agreement. Furthermore, in so describing it, they stated that the rate was to apply not to the damages which may have accrued but rather to the damage "award" or the "award" of damages. Next, an "award" is that sum payable to one party or another as decreed by the trial court. As such, it does not come into existence until the trial court pronounces or executes judgment. Logically, then, because the interest rate contemplated in the Rule 11 agreement was to apply to the sum awarded in the judgment, it could only have prospective application for no "award" existed prior to the court decreeing it.

11

In other words, the parties did not state that the interest rate was to apply to damages *per se*. Rather, they said that it was to apply to the "award," which means the sum decreed in the judgment. So, to the extent that the trial court awarded damages, that "award" was to accrue interest at the Chase prime plus two percent "on the last day of the banking month, compounded monthly," not the damages suffered by the litigant prior to the "award." That the litigants may have intended otherwise does not matter since they, and we, are bound by the unambiguous language adopted in their agreement. *Id.* at 26-27.

However, this does not end the matter for it appears that in calculating prejudgment interest the trial court utilized the formula contained in the Rule 11 agreement, which formula was inapplicable. Consequently, while the reasoning behind Golden's attack upon the calculation may be wrong, it is correct in attacking the determination. So, to that extent, we sustain the issue for the reasons we discussed.

*Attorney's Fees*

Golden lastly attacks the trial court's award of attorney's fees. It does so on the basis that the court erred in ultimately denying Golden recovery while granting Denver both damages and declaratory relief. Since we found some error in the trial court's decision and Denver did not prevail to the extent decreed by the trial court, the award may be subject to modification. *See State Farm Lloyds v. C.M.W.,* 53 S.W.3d 877, 893-94 (Tex. App.–Dallas 2001, pet. denied) (holding that a trial court may award a prevailing party its attorney's fees). Consequently, we sustain the issue in part.

In sum, those portions of the trial court's partial summary and final judgments 1) denying Golden's contention that Denver breached the PPA by failing to provide spinning reserves at no cost, 2) awarding Denver prejudgment interest, and 3) awarding Denver

12

attorney's fees in the amount given are reversed and remanded to the trial court. In all other things, the judgment is affirmed.


Brian Quinn
Chief Justice