

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00132-CV

IN RE J. RAINS, ANNUITANT

On Appeal from the 66th District Court
Hill County, Texas
Trial Court No. 51350, Honorable F.B. (Bob) McGregor, Presiding

August 5, 2015

OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Esau sold his inheritance to Jacob for a bowl of lentil soup. Apparently, no statute existed at the time requiring a court to decide whether that transaction was in Esau's best interests. Such a statute exists today and regulates the sale of interests in structured settlements to factors. The factor at bar is J.G. Wentworth Originations, LLC (Wentworth). The beneficiary of the structured settlement is Jaime Rains. And though an inheritance is not in question, the property interest at issue arose from the untimely death of Rains' mother purportedly due to medical malpractice. Rains was six-years-old at the time of her mother's death and sixteen when the malpractice claims were finally resolved. When resolved, Rains became the beneficiary of an annuity paying her $805

a month for at least fifty years.  Now in her mid-thirties, Rains discussed with Wentworth her interest in transferring a portion of her payments in exchange for a lump sum.  The two ultimately agreed that she would relinquish $405 dollars a month for ten years, or $48,600.  In exchange, Wentworth would immediately pay her $24,000.[1]  The effective rate of return to be received by the factor approximated 17.4%.  The trial court approved the transaction over the objection of Metropolitan Life Insurance Company (Met), the entity that provided Rains the annuity.  Met appealed, contending, among other things, that the transaction was not in Rains' best interest and that the trial court could not order it to pay the entire $805 to Wentworth.  We reverse.

*Preliminary Matters*

We initially dispense with Wentworth's suggestion that because the annuity belonged to Rains, she was free to sell it if she cared to.  That a payee of an annuity may have a transferable property right is conceded.  Equally conceded is that the payee may wish to sell all or part of her interest in the annuity.  Yet, effectuation of the sale is not dependent solely upon the payee's whim if the annuity is part of a structured settlement.

According to statute, the Structured Settlement Protection Act, a structured settlement is "an arrangement for periodic payment of damages for personal injuries or sickness established by settlement or judgment in resolution of a tort claim or for periodic payments in settlement of a workers' compensation claim."  TEX. CIV. PRAC. & REM. CODE ANN. § 141.002(13) (West 2011).  Before a payee of a structured settlement can transfer an interest in it, certain conditions must be met.  First, the recipient of the

---

[1] To paraphrase Popeye's rotund friend Wimpy:  "I'll gladly pay you $48,600 tomorrow for $24,000 today."

transfer must make certain disclosures to the payee under § 141.003 of the Act. *Id.* § 141.003.

Second, and more importantly, statute provides that "[n]o direct or indirect transfer of structured settlement payment rights shall be effective and no structured settlement obligor or annuity issuer shall be required to make any payment directly or indirectly to any transferee of structured settlement payment rights unless the transfer has been approved in advance in a final court order . . . ." *Id.* § 141.004. That is, approval of the transfer is dependent upon a court expressly finding that: (1) "the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;" (2) "the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the advice in writing;" and (3) "the transfer does not contravene any applicable statute or an order of any court or other governmental authority." *Id.*

Other limitations upon the payee's ability to complete the transfer also exist. For instance, "neither the structured settlement obligor nor the annuity issuer may be required to divide any periodic payment between the payee and any transferee or assignee or between two or more transferees or assignees . . . ." *Id.* § 141.005(4).

Enactment of the foregoing conditions arose from the legislature's desire to protect beneficiaries of structured settlements from transferring their interests for inadequate compensation. *See Wash. Square Fin. LLC v. RSL Funding, LLC,* 418 S.W.3d 761, 769 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (stating that many "Texas courts have recognized that the Act's purpose is to protect those who have

3

entered into structured settlements . . . from transferring their rights to future periodic payments for a lump-sum payment that is inadequate"). While its intent is not to prohibit all assignments, the precautionary measures required by the Act exist to safeguard potential assignors against abuse or exploitation by factoring companies. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 728-29 (Tex. App.—Dallas 2004, no pet.); *accord Rapid Settlement, Ltd. v. Green*, 294 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (stating that "Texas, as well as 42 other states, enacted the SSPA to protect unwary tort claimants from potential abuse in their transactions with these companies."). Indeed, the name given to the statute by the legislature manifests the foregoing policy. Labeled the "Structured Settlement Protection Act," TEX. CIV. PRAC. & REM. CODE ANN. § 141.001 (West 2011), it serves a "paternalistic" purpose. *Johnson v. Structured Asset Servs. LLC,* 148 S.W.3d at 729. And, given that the Texas judiciary is charged with approving the transfers, it falls upon the same judiciary to assume the "paternalistic" mantel and assure that the intended protection exists in fact, not merely in word.

Here, no one disputes that the provisions of the Structured Settlement Protection Act apply to the transaction between Rains and Wentworth. The controversy before us concerns 1) whether the trial court can obligate Met to send Wentworth all of the monthly payments due Rains though she only assigned a portion of those payments to the factor (*i.e.* Wentworth), and 2) whether the assignment was in Rains' best interest. We address the latter first.

*Best Interest*

As previously mentioned, a court must find that the transfer "is in the best interest of the payee . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 141.004(1) (West 2011). Needless to say, the "best interest of the payee" is a rather non-specific standard. Few Texas authorities have discussed the provision at length or the indicia a trial court should consider when making the determination.[2] Yet, they obviously consist of more than mere wishes of the payee. Indeed, the legislature mandated that "the welfare and support of the payee's dependents" also be weighed. *Id.* Reasonably within that penumbra would lie such information as 1) the financial resources and income available to the payee and her dependents other than the structured settlement payments, 2) the extent or amount of both the payee's debt and expenses and those of her family and their ability to pay the same, 3) the assets (both real and personal) available to the payee and her family, 4) the future yet reasonably foreseeable liabilities of the payee and her family, 5) the future yet reasonably foreseeable domestic, economic, physical, medical, and educational needs of the payee and her dependents, 6) the payee's current need for and intended use of the lump sum to be received, 7) the number of dependents maintained by the payee and their age, and 8) the percentage of payments being assigned.

That the statute was enacted to shield against possible exploitation and abuse by factors also suggests other indicia meriting consideration. Included among them would be such things as 1) the payee's age, education and acumen, 2) the payee's business or financial acumen, 3) the payee's ability to secure independent and informative

---

[2] Indeed, it is because of the relative lack of Texas authority applying the Structured Settlement Protection Act that we turn to authority from other jurisdictions for guidance at times.

financial advice, 4) the payee's attempt to secure independent and informative financial advice if she otherwise lacked financial acumen, 5) the value being received in exchange for the value being relinquished by the payee, 6) the payee's effort, if any, to maximize her return, 7) the payee's search for and communication with other factors, 8) the presence of other factors or entities willing to strike a bargain and the value they would give in exchange for the value received, 9) financial alternatives available to the payee, if any, and 10) the financial capability of the factor to perform depending upon the manner in which the assignment is structured.

By no means are the foregoing indicia exclusive. Nor is any particular indicia determinative. Rather, they and any other thought pertinent serve as a means of assisting the trial court in arriving at an informed decision. Simply put, there is no bright line, and the outcome in each case depends upon the circumstances involved in that case. *See In re Settlement Capital Corp.*, 769 N.Y.S.2d 817, 823-24 (N.Y. 2003) (stating that the "'best interest'" standard under the . . . [New York equivalent to § 141.001 *et seq.*] requires a case-by-case analysis to determine whether the proposed transfer of structured settlement payments, which were designed to preserve the injured person's long-term financial security, will provide needed financial rescue without jeopardizing or irreparably impairing the financial security afforded to the payee and his or her dependents" and that consideration should be given "to such factors as the payee's age; mental and physical capacity; maturity level; ability to show sufficient income that is independent of the payments sought for transfer; capacity to provide for the welfare and support of the payee's dependents; the need for medical treatment; the stated purpose for the transfer; and the demonstrated ability of the payee to appreciate

the financial terms and consequences of the proposed transfer based upon truly independent legal and financial advice."); *Settlement Funding/Peachtree Settlement Servs. Corp. v. Prudential Assigned Settlement Servs. Corp.*, No. S1471-10 CnC, 2011 Vt. Super. LEXIS 6, at *13-14 (S. Ct. Vt. March 24, 2011) (stating the same); *In re Seneca One, LLC*, No. 06-02054B, 2007 Mass. Super. LEXIS 14, at *19-27 (S. Ct. Mass. January 25, 2007) (discussing and applying similar factors); *Settlement Capital Corp. v. State Farm Mut. Auto Ins. Co.*, 646 N.W.2d 550, 556 (Minn. Ct. App. 2002) (stating that "the best interests determination involves a more global consideration of the facts, circumstances, and means of support available to the payee and his or her dependents. These considerations would include, among other case specific factors, the reasonable preference of the payee, in light of the payee's age, mental capacity, maturity level, and stated purpose for the transfer.").

Irrespective of what considerations the trial court may weigh, the record must illustrate that it did more than simply "rubber stamp" whatever bargain the factor may have struck with the payee. Again, the trial court must assure itself, and those reviewing its decision, that the bargain served the payee's best interest as mandated by the legislature. Often, structured settlements come with a high price. Someone has sacrificed either life or limb in their creation. Preventing others from taking improper and unwarranted advantage of that human cost would seem the least that trial courts could do when applying § 141.004(1).

We now turn to the factual record at bar and find it rather sparse. The transaction between Rains and Wentworth was initially approved at a hearing. That hearing consisted of no more than oral argument proffered by counsel for Met and

7

Wentworth. No one offered, nor did the trial court accept, any testimony, exhibits, or evidence. Nor were the documents memorializing the agreement between Wentworth and Rains offered into evidence. Nor does the record reflect that Rains secured independent counsel to represent her interest at the hearing. Though the reporter's record indicated that she was present and appeared *pro se*, counsel for Wentworth referred to her as "my client".[3] Should the latter statement be afforded credence, then Wentworth, an entity seeking to obtain monetary benefit from Rains, retained the same legal counsel to represent it and her. Most importantly, the trial court approved the transfer after finding that it was in Rains' best interest, despite Wentworth's utter failure to present evidence on the matter.[4] That it had the burden to satisfy the requirements imposed by the Structured Settlement Protection Act is clear. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 141.004 (West 2011). That argument and unsworn representations of counsel generally are not competent evidence is also clear. *Las Palmas Medical Center v. Moore*, 349 S.W.3d 57, 67 (Tex. App.—El Paso 2020, pet. denied). If nothing else, Wentworth's failure to present any witnesses, testimony, or evidence at the first hearing depicts a rather inattentive approach to satisfying the demands of the Structured Settlement Protection Act.

An attempt to remedy the foregoing dearth of evidence occurred when Met moved the trial court to stay its order pending appeal. At that point, the trial court convened another hearing. Appearing were Wentworth and Met, through their

---

[3] The record passage consisted of Wentworth's attorney saying: "Your Honor, could we take a break so *my client* -- the annuitant can take her son to the restroom?" (Emphasis added). Rains was the "annuitant."

[4] All counsel provided argument and alluded to miscellaneous information. Yet, unsworn argument by counsel generally is not evidence. *Las Palmas Medical Center v. Moore*, 349 S.W.3d 57, 67 (Tex. App.—El Paso 2010, pet. denied).

respective legal counsel, and Rains, *pro se.* Wentworth called Rains to testify. While testifying, she revealed that she was thirty-four years old, married, had four children, and lived on eleven acres of land in a two bedroom, one bathroom house. So too did she inform the trial court about 1) the death of her mother, 2) the settlement of a tort action resulting in her acquisition of the annuity, 3) her receipt of $805 per month from the annuity upon turning twenty-five, 4) her interest in liquidating a portion of that annuity soon after the payments began, 5) investigating the possibility by calling Wentworth, 6) opting not to pursue the transaction at the time, 7) resurrecting her interest in liquidating a portion of the annuity, 8) agreeing to assign approximately half of her monthly payment to Wentworth for a period of ten years, 9) receiving $24,000 from Wentworth in exchange for her assignment, 10) how she "want[ed] to keep a portion of the payment [because] . . . . there's been many times that we wouldn't have survived well without the 805 a month . . . ," 11) knowing that she has "to give up some money in the future" to receive the $24,000 now and that she is getting "a discounted amount," and 12) receiving a disclosure statement from Wentworth revealing the sums she is relinquishing and receiving. When asked her purpose for engaging in the transaction, Rains stated that she wanted to "pay off" a $17,000 loan for her vehicle, "pay off" credit card debt of $2,500, and expend the balance on "add[ing] . . . to our home." She did not know what the latter would cost, though; nor did she describe the nature of the prospective home addition. In answer to whether she had investigated the possibility of securing a loan to accomplish those purposes, Rains said no because she had loans and could not pay another one; the amount of those loans was undisclosed. Though she said that her husband had "full-time" employment, no mention was made of his

income.  She acknowledged that she earned some income painting furniture, though the amount earned again went unmentioned.  Opting to transfer only $405 would not put her in an "economic bind," she further testified, because she would no longer have to make a $410 monthly car payment.

Other of her testimony consisted of 1) her willingness to release Met from liability and "look only to" Wentworth for payment, 2) her belief that the transaction was in her best interest, 3) her desire for the court to approve it, 4) her effort to call only one other factor, though she could not recall the identity of that factor or the proposal discussed, 5) her refusal to seek independent legal advice though advised to, 6) her failure to seek advice from an accountant or "anybody with a financing background," 7) Wentworth's agreement to pay for all her legal fees and court costs, 8) her speaking to her husband about the transaction (though nothing was said about what her husband said), and 9) her willingness to consummate the transaction.[5]

Missing from the evidence is discussion about the net income received by the Rains' household, Rains' education, Rains' business acumen, the current and prospective financial needs of Rains and her family, the nature of her prospective home addition and the need for same.  Nor did she seek independent legal or financial advice about the transaction, and the record failed to reveal the extent, if any, of her husband's education and financial experience.  Nor did she expend much effort to investigate

---

[5] Again, approval of the sale was dependent upon the trial court executing various fact findings. One mandated by statute was the finding that "the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the advice *in writing*."  TEX. CIV. PRAC. & REM. CODE ANN.  § 141.004(2) (West 2011) (Emphasis added).  No one has directed us to anything of record illustrating that Rains waived, *in writing*, her opportunity to secure legal and financial advice, and our own perusal of the record uncovered no such writing.

alternatives to simply selling a portion of the annuity. Yet, she admitted to having been unable to survive, at times, without the $805 payment.

To the foregoing, we add evidence of the effective discount rate charged by Wentworth which approximated 17.4%. One court from a sister state described a seventeen to eighteen percent discount rate as "steep" and "troubling." *In re Transfer of Structured Settlement Rights of Spinelli*, 803 A.2d 172, 179 (N.J. Super Ct. Law Div. 2002) (involving a 17%-18% rate).[6] Other courts have refused to approve transfers involving lesser rates. *E.g., In re Settlement Capital Corp.,* 769 N.Y.S.2d at 828-29 (involving a 15.46% rate); *In re Settlement Funding of N.Y., L.L.C.*, 761 N.Y.S.2d 816, 818-19 (N.Y. 2003) (stating that "[t]he petitioners have failed to show that 15.46% is a 'fair and reasonable' interest rate"). The decision to forego approving the transfer in *Settlement Corp.* and *Settlement Funding* was not necessarily because the rate was exorbitant but rather because ". . . there was no showing as to how . . . [the] factors [mentioned] specifically resulted in the discount rate applied . . .," *In re Settlement Capital Corp. supra*, or none of the justifications proffered were "relevant to the question of whether . . . [the rate] is 'fair and reasonable.'" *In re Settlement Funding of N.Y., L.L.C.*, *supra*; *see also Davis v. Traveler's Cas. & Sur. Co.*, No. CV020815609, 2002 Conn. Super. LEXIS 2256, at *8-9 (Conn. Super. June 10, 2002) (concluding that the 19.82% discount rate was too high given the 5.6% federal interest rate and the annuitant's failure to present evidence contradicting the conclusion).[7] In other words,

---

[6]Though the assignment in the *Settlement Rights* case was ultimately approved, the trial court approved it due to evidence illustrating the annuitant's rather high education and financial acumen. *In re Transfer of Structured Settlement Rights of Spinelli*, 803 A.2d 172, 179 (N.J. Super. Ct. Law Div. 2002).

[7] Some of the statutes enacted in these foreign jurisdictions required not only that the transaction be in the payee's best interest but also that the discount rate and expenses charged be "fair and reasonable." *E.g.,* N.Y. GEN. OBLIG. § 5-1706(b) (Consol). The Texas Structured Settlement Act contains no such provision. Yet, as previously stated, numerous indicia may be considered in assessing not only

the factor did not carry its burden to justify the rate charged. A similar deficiency appears at bar.

Neither Wentworth nor Rains attempted to illustrate how anyone derived the 17.4% rate here. Nor did they attempt to justify its adoption. Also missing is evidence that lesser rates were unavailable or that the rate levied was the norm for like transactions. Moreover, the disclosure form supplied by Wentworth revealed that the "discounted present value" of the $48,600 worth of payments Rains assigned was $43,538.71 when the federal interest rate at the time of 2.20% was applied.[8] Instead of paying Rains $43,538.71, Wentworth paid her only $24,000.[9] Though businesses are entitled to make a profit, the deficiency of about $20,000 warranted explanation.[10]

It cannot be denied that if our review of the final order was solely dependent upon consideration of the evidence presented in the first hearing, the order would not be approved. Again, no evidence was taken to support the eventual conclusion that the transfer was in Rains' best interest. Admittedly, some of the void was filled when Rains testified at the second hearing. Yet, pivotal topics went unaddressed such as whether

---

the best interest of the payee under § 141.004 of the Texas Civil Practice and Remedies Code but also whether the payee is being abused or exploited. Thus, the discount rate applied and its fairness cannot be ignored.

[8] Statute requires the factor to give the payee a disclosure statement which reveals, among other things, "the discounted present value of the payments to be transferred, which shall be identified as the 'calculation of current value of the transferred structured settlement payments under federal standards for valuing annuities,' and the amount of the Applicable Federal Rate used in calculating the discounted present value." TEX. CIV. PRAC. & REM. CODE ANN. § 141.003(3) (West 2011).

[9] Wentworth's own counsel represented to the trial court that Rains was "losing money" in the deal. In attempting to rebut Met's argument that payments could not be divided (an issue we address below) she told the court that: "[t]hey're claiming that it's not in her best interest to sell a portion of her payment, but instead they'd like to have her sell the entire payment, *which would actually cause her to lose more money* by selling the entire annuity early." (Emphasis added). Implicit within the contention that she would "lose more money" if she sold her entire payment is the recognition that she is already losing money.

[10] Here and below, Wentworth argued that it will make no profit on this transaction given the litigation that occurred. This contention is of little moment since the statute directs the court to focus upon the best interest of the payee or Rains. The best interest of the factor is irrelevant.

the discount rate was justifiable under the circumstances or simply an effort to take advantage of someone who contemplated selling some or all of her structured settlement from the "get-go." Nor does the record contain evidence indicating that the Rains family was capable of surviving economically without the entire $805 per month. Again, Rains admitted that without the monthly payment, the family periodically experienced hardship. Whether the circumstances causing that hardship no longer existed due to the presence of increased family income or some other factor was and is unknown. Indeed, the record even fails to disclose the amount of income earned by the family. Nor does it disclose the amount of debt for which the family is liable or its monthly expenses. Nor was much said about Rains' dependents, their prospective needs, and whether their welfare and support could be maintained given the loss of over half of the $805 payment. This missing information leads us to conclude that Wentworth failed to fulfill its burden.

As transferee of the payments, Wentworth had the responsibility of complying with § 141.003 and fulfilling the conditions of § 141.004. TEX. CIV. PRAC. & REM. CODE ANN. § 141.007(f) (West 2011). But the minimal evidence it presented denied the trial court opportunity to adequately exercise its "paternalistic" role and assess whether 1) the "transfer . . . [was] in the best interest of the payee, taking into account the welfare and support of the payee's dependents" and 2) the payee fell victim to the abuse or exploitation of a factor. Whether the best interest of a party was met tends to be an exercise implicating the trial court's discretion. *See e.g. Webre v. Black*, 458 S.W.3d 113, 116-17 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (applying the standard of abused discretion when determining whether a settlement was in the best interest of a

13

ward).  Yet, to legitimately exercise that discretion, a trial court must have sufficient evidence before it to support the manner in which it exercised that discretion.  *See Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.). (determining whether sufficient evidence supports the decision is part of deciding whether the trial court abused its discretion).  Wentworth failed to provide the trial court with that information as explained above.  Consequently, we sustain Met's issue.

*Modify Contract*

Next we address Met's argument that the trial court lacked authority to order it to send the entire $805 monthly payment to Wentworth.  That directive appears in the trial court's order and was placed there to avoid conflict with § 141.005(4) of the Civil Practices and Remedies Code.  According to the latter, ". . . neither the structured settlement obligor nor the annuity issuer may be required to divide any periodic payment between the payee and any transferee or assignee or between two or more transferees or assignees."  Tex. Civ. Prac. & Rem. Code Ann. § 141.005(4) (West 2011).  We sustain the issue.

A contract is a bargain struck by two or more individuals or entities.  It encompasses the rights and obligations which the parties were willing to accept.  And, to the extent that they struck the bargain, the bargain is theirs to modify.  While a court is empowered to construe the respective rights and obligations of those parties under their agreement, it is not a party to the agreement.  Nor does it have the inherent authority to modify or rewrite that agreement on behalf of the parties.  *See Golden Spread Elec. Coop., Inc. v. Denver City Energy Assoc., L.P.* 269 S.W.3d 183, 187 (Tex. App.—Amarillo 2008, pet. denied).  As stated by our Supreme Court, "[c]ourts cannot

14

make new contracts between the parties, but must enforce the contracts as written." *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965). If the terms of the contract are definite and unambiguous, "the courts cannot vary these terms." *Id.*

Here, Met contracted with Rains to pay her $805 per month. To the extent that a portion of that payment was assigned and an assignee comes to stand in the shoes of the assignor, *Southwestern Bell Tel. Co. v. Mktg. on Hold, Inc.*, 308 S.W.3d 909, 920 (Tex. 2010), Met's duty became twofold. It had to pay Wentworth that portion assigned by Rains and pay Rains the remainder per the annuity contract. It did not agree to be relieved of the latter obligation. Nor did either Rains or Met contend that the obligation to deliver the payment to Rains was ambiguous or indefinite. Nonetheless, the trial court entered an order directing it to "forward the entire amount of each structured settlement payment that includes the Assigned Payment to Transferee with Transferee to retain each Assigned Payment and remit the remainder of each payment to the Payee." Again, this was done to avoid running afoul of the prohibition in § 141.005(4) against requiring obligors, like Met, to divide payments between two recipients. In perusing § 141.005(4), we found nothing that authorized a trial court to unilaterally modify the terms of a previously existing contract. Nor did our perusal of the remaining provisions of the Structured Settlement Protection Act uncover any such authority. So, the trial court had no authority to simply decide to change those portions of the annuity contract obligating Met to pay Rains. The terms of the contract regarding Met's obligation to pay Rains were unambiguous and definite; thus, the court was obligated to enforce them as written unless the parties agreed otherwise. Not all of them did here. So, the trial court erred.

15

We reverse the final order approving the transfer of Rains' structured settlement payments, and the order reconfirming that final order, and remand the cause to the trial court for further proceedings consistent with this opinion.


                                        Brian Quinn
                                        Chief Justice