# NVM NESBITT, VASSAR & McCOWN, L.L.P.

attorneys | counselors

ACCEPTED
04-15-00482-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
6/6/2016 11:45:35 AM
KEITH HOTTLE
CLERK

15851 Dallas Parkway, Suite 800, Addison, Texas 75001
Phone: 972.371.2411 Fax: 972.371.2410 Web: www.nvmlaw.com

WRITER'S EMAIL: ENESBITT@NVMLAW.COM

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
6/6/2016 11:45:35 AM
KEITH E. HOTTLE
Clerk

June 6, 2016

**Via E-Filing**

Justice Karen Angelini
Justice Rebeca C. Martinez
Justice Patricia O. Alvarez
Fourth Court of Appeals
Justice Cadena-Reeves Justice Center
300 Dolorosa, Suite 3200
San Antonio, Texas 78205-3037

Re: Case No. 04-15-00482-CV; *In re Esperanza Hughes*; in the Fourth Court of Appeals

Dear Justices Angelini, Martinez, and Alvarez:

I accordance with Local Rule 8.3, the purpose of this letter is to advise the Court of the Texas First Court of Appeals' recent decision in Metro. Ins. & Annuity Co. v. Peachtree Settlement Funding, LLC, 2016 Tex. App. LEXIS 5912 (Tex. App.—Houston [1st Dist.] June 2, 2016) (the "Swain Case"). The Swain Case decides issues that are very similar, and in many instances virtually identical, to the issues raised in the present case. For the Court's convenience, the opinion in the Swain Case is attached.

Sincerely,

/s/ Earl S. Nesbitt

Earl S. Nesbitt

cc:   <u>Via E-Mail and U.S. Mail</u>
Mathis B. Bishop
300 Convent Street
Bank of America Plaza, 25th Floor
San Antonio, Texas 78205-3789

<u>Via E-Mail and U.S. Mail</u>
Stephen R. Harris
Andrew Lorin
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103

<u>Via U.S. Mail</u>
Esperanza Hughes

**Opinion issued June 2, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00147-CV

_____

**METROPOLITAN INSURANCE AND ANNUITY COMPANY AND METROPOLITAN LIFE INSURANCE COMPANY, Appellants**

**V.**

**PEACHTREE SETTLEMENT FUNDING, LLC, Appellee**

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2014-74548**

# O P I N I O N

This dispute arises from an agreement in which Sara Swain[1] transferred to Peachtree Settlement Funding, LLC ("Peachtree") a portion of her structured settlement payments she receives from Metropolitan Life Insurance Company

---

[1]   Swain did not file a brief or otherwise appear in this appeal.

("Metropolitan Life") and Metropolitan Insurance & Annuity Company ("Metropolitan Annuity") in exchange for a lump-sum payment from Peachtree. Peachtree sought and obtained a final order from the district court, approving the agreement to transfer the structured settlement payments from Swain to Peachtree.

On appeal, Metropolitan Annuity and Metropolitan Life (collectively "MetLife") challenge the order, raising five issues. MetLife contends (1) the district court's order rewrites certain contracts between MetLife, Swain, and other interested parties; (2) the order improperly circumvents the Structured Settlement Protection Act; (3) the district court erroneously ordered a "servicing arrangement" between MetLife and Peachtree; (4) the order contravenes an order of another court; and (5) the district court abused its discretion in finding that the transfer of Swain's structured settlement payments to Peachtree was in her best interest.

We affirm.

**Background**

In 2001, Swain's maternal grandparents, as her guardians, signed a structured settlement on behalf of 15-year-old Swain to settle a Wisconsin lawsuit, which arose from the death of Swain's mother. A Wisconsin court signed an order approving the structured settlement, which entitled Swain to receive monthly periodic payments of $1,460.00 beginning on May 10, 2010, when she reached the age of 25. The payments would continue for the remainder of Swain's life and

2

were guaranteed for 40 years, through April 10, 2050. The periodic payment amount would increase 3% annually beginning in May 2011. Metropolitan Annuity assumed the obligation to make these payments by way of a qualified assignment. Metropolitan Annuity funded its obligation to make the periodic payments to Swain by purchasing an annuity from Metropolitan Life.

On January 5, 2015, Swain and Peachtree signed an agreement ("the Transfer Agreement") in which Swain agreed to transfer to Peachtree, a factoring company, the right to receive, each month for 132 months (11 years), a portion of her structured-settlement payments.[2] The Transfer Agreement provided that Peachtree would receive $495 each month out of Swain's monthly structured-settlement payments, beginning May 10, 2015 and ending April 10, 2026. The amount that Peachtree would receive each month out of Swain's periodic payments would increase annually by 3%. In exchange for receiving the assigned payments, Peachtree agreed to pay Swain a lump sum of $49,716.26.

Seeking to comply with the requirements of the Structured Settlement Protection Act (SSPA), which requires a court to approve the transfer of structured settlement payment rights, Peachtree filed its "Application for Approval of Sale of

---

[2] "A factoring company buys streams of future structured-settlement payments in exchange for discounted lump-sum payments." *RSL-3B-IL, Ltd. v. Prudential Ins. Co. of Am.*, 470 S.W.3d 131, 133 n.1 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). The Structured Settlement Protection Act requires court approval for all direct or indirect transfers of structured settlement payment rights in Texas. *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.004 (Vernon 2011)).

3

Partial Payment Rights" with the 234th District Court of Harris County on December 30, 2014. In its application, Peachtree asserted that the transfer of the assigned payments to Peachtree was in Swain's best interest and requested the district court to approve the transfer. One week later, Peachtree filed an amended application with the district court, attaching the Transfer Agreement and a disclosure statement signed by Swain.

Peachtree served MetLife with the application and its attachments. MetLife responded, filing an opposition to Peachtree's application. Primary among its objections was MetLife's assertion that the agreement between Swain and Peachtree would require MetLife to split the structured settlement payments between Swain and Peachtree. MetLife pointed out that requiring it to split payments contravenes the SSPA, which provides that "neither the structured settlement obligor nor the annuity issuer may be required to divide any periodic payment between the payee and any transferee or assignee or between two or more transferees or assignees." TEX. CIV. PRAC. & REM. CODE ANN. § 141.005(4) (Vernon 2011).

MetLife also pointed out that Peachtree had not requested in its application that the district court order a "servicing arrangement." Under a service arrangement MetLife would be required to send the full amount of the periodic payment to Peachtree. Peachtree would retain its assigned portion of the payment

4

and remit the remaining unassigned portion of the payment to Swain. MetLife asserted that, even if it had requested a servicing arrangement, Peachtree was not entitled to such relief. MetLife averred that the imposition of such relief was not authorized by SSPA. MetLife further asserted that imposing a servicing arrangement on it would force MetLife into a business relationship with Peachtree that it did not want, thereby violating MetLife's liberty interests by taking away its freedom to contract. Peachtree further asserted that the transfer of the assigned payment was not in Swain's best interest, as required by the SSPA.

The trial court conducted a hearing on the application on February 2, 2015. MetLife continued to object to the approval of the transfer of the assigned structured settlement payments on the same grounds it had raised in its opposition to Peachtree's application. In addition to MetLife's and Peachtree's counsel, Swain also appeared at the hearing. Although she did not testify, the district court asked Swain questions related to the transaction with Peachtree, which she answered. Swain told the court that she was 26 years old. She also informed the court that she had received financial advice regarding the transfer from her grandfather, who owned his own accounting firm.

Peachtree also offered two exhibits at the hearing. Exhibit 1 was a schedule detailing how much of the respective payments Peachtree and Swain would receive over the course of the 132-month period covered by the transaction. The second

exhibit was an amortization schedule, showing that the "effective annual rate" charged by Peachtree for the transfer was 7.822%.

Following the hearing, the district court signed a "Final Order Approving Transfer Structured Settlement Payment Rights" ("Final Order"), which included the following findings:

> 5. The proposed transfer of the Assigned Payments by and between Peachtree and Ms. Swain, as reflected in the Transfer Agreement and described in the Application, satisfies and complies with all statutory requirements of the [SSPA] and does not contravene any applicable statute or an order of any court or other governmental authority . . . .
>
> 6. The transfer is in the best interest of [Swain], taking into account the welfare and support of [Swain's] dependent.
>
> 7. [Swain] has been advised in writing by [Peachtree] to seek independent professional advice regarding the transfer, and has either received the advice or knowingly waived the opportunity to seek and receive said advice in writing.
>
> 8. Disclosures to [Swain] were made, and notices of the hearing and the filing of the Application were provided to all interested parties, including [MetLife] in accordance with [the SSPA] . . . .
>
> 9. The Court has considered the objection/opposition filed by [MetLife] and herby overrules and denies said objection/opposition.
>
> 10. The Court further finds that [MetLife is] not being and will not be required or directed to divide any structured settlement/annuity payments amongst Ms. Swain and Peachtree or any other party.
>
> The Final Order further provided as follows:
>
> Based on the foregoing findings and the evidence submitted to the Court and being satisfied that the proposed transfer satisfies all applicable statutory requirements, IT IS ORDERED, ADJUDGED,

6

AND DECREED that the Application is GRANTED and the transfer and assignment of all of [Swain's] right, title, and interest in and to the Assigned Payments by [Swain] to Peachtree, its successors and/or, assigns, is APPROVED.

IT IS FURTHER ORDERED that the MetLife['s] Opposition is hereby denied and overruled.

IT IS FURTHER ORDERED that in furtherance of the Court's order granting the Application and approving the proposed transfer described herein, Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company, are hereby authorized and directed to pay and remit to Peachtree (as Ms. Swain's designated and authorized payment agent for purposes of receiving the Term Payments) 100% of the Term Payments[3] (the monthly structured settlement/annuity payments that come due and owing by Metropolitan Life and/or Metropolitan Insurance from May of 2015 through April of 2026), when and as said payments come due. Upon receipt of each monthly Term Payment, Peachtree is entitled to retain the portion of each Term Payment that constitutes an Assigned Payment, and is ordered to pay and remit to Ms. Swain the portion of said Term Payments that constitute the Remaining Swain Monthly Payments. (This arrangement shall be referred to as the "Servicing Arrangement.")

IT IS FURTHER ORDERED that the Term Payments shall be sent directly to Peachtree by Metropolitan Life pursuant to this order and the Servicing Arrangement described herein, at the following address or to such other address designated by Peachtree: [Peachtree's address]

IT IS FURTHER ORDERED that Metropolitan Life and Metropolitan Insurance shall absolutely, irrevocably, and forever discharge and satisfy their legal and contractual obligation to make the Term Payments (including the Assigned Payments and the Remaining Swain Monthly Payments) by paying and remitting said Term

---

[3] The order defined "Term Payments" as "[t]he total monthly structured settlement/annuity payments coming due and owing from May of 2015 through April of 2026."

7

Payments to Peachtree pursuant to this court order and the Servicing Arrangement and by doing so, Metropolitan Life and Metropolitan Insurance are released from, and shall have not have, any current or future liability to Ms. Swain for the Term Payments. By signing and approving this order, Ms. Swain acknowledges, understands, and agrees that [s]he will receive the Remaining Swain Monthly Payments through Peachtree (as her designated payment agent solely for purposes of receiving and distributing the Term Payments pursuant to the Servicing Agent and this Final Order) and that [MetLife] shall not be obligated to make any portion of the Term Payments directly to Ms. Swain; that Ms. Swain shall look solely and exclusively to Peachtree for the Remaining Swain Monthly Payments; and that [MetLife] shall not, following the signing of this Final Order by the Court, have any obligation or liability (contractual or legal) to Ms. Swain relative to the Term Payments, including the Remaining Swain Monthly Payments.

IT IS FURTHER ORDERED that the Remaining Swain Monthly Payments shall remain the property of Ms. Swain, even though said payments are to be paid and remitted to Peachtree pursuant to the Servicing Arrangement and this Final Order.

IT IS FURTHER ORDERED that Metropolitan Life and Metropolitan Insurance are not being forced or required or ordered to split or divide any structured settlement/annuity payments amongst Ms. Swain and Peachtree and shall not be required to do so in the future.

IT IS FURTHER ORDERED that [MetLife] shall irrevocably change the beneficiary for the Assigned Payments to [Peachtree], and no other individual or entity other than [Peachtree] shall have the authority to change the beneficiary for the Assigned Payments.

IT IS FURTHER ORDERED that pursuant to the Texas Transfer Statute, by making and delivering the Term Payments to [Peachtree] as set forth in the preceding paragraphs, MetLife shall, as to all parties except [Peachtree], be discharged and released from any and all liability for the Term Payments.

Swain signed the Final Order, approving it as to form and substance.

On February 13, 2015, MetLife filed a notice of appeal, seeking review of the district court's Final Order. In response, Peachtree filed its "Motion for New Trial and/or to Supplement the Record and Present Additional Testimony." Peachtree averred,

> [O]ut of an abundance of caution, and in light of MetLife's Notice of Appeal and the lack of clarity regarding the basis of MetLife's appeal, Peachtree files this Motion and seeks to present additional testimony and present evidence (in recognizable form) from Ms. Swain related to the Application and the proposed transfer and the best interest issue.

Peachtree requested the district court to "grant the Motion and the requested relief and schedule and convene a second hearing on the Application to allow Peachtree . . . to present evidence related to same[.]" The trial court granted Peachtree's motion and held an evidentiary hearing on April 6, 2015.

Swain testified at the hearing. In her testimony, Swain discussed issues relevant to her financial situation and her understanding of the terms of the Transfer Agreement.

Swain testified that she was in a committed relationship with her boyfriend and that they have an 18-month-old daughter. She stated that she worked full time at a restaurant, netting $700 per week and that her boyfriend owned his own contracting business. Swain testified that, after the transfer, she would continue to receive almost $1,200 per month from her structured settlement, which was an acceptable amount to her. Swain testified that her grandfather had always acted as

9

her financial advisor and that he had given her financial advice about the transfer. She said that he had negotiated the deal for her with Peachtree. She indicated that her grandfather had financial expertise, stating that her grandfather had owned his own accounting business for 20 years. Swain also stated that she had shopped around with other factoring companies and had determined that Peachtree's offer was the best deal she could find. Swain testified that, in addition to repaying her grandfather a $9,000 loan that he had given her to buy a car, she planned to use the majority of the nearly $50,000 she received from Peachtree to buy a home in Katy, Texas. Swain explained that she and her family had been living with relatives who had eight children and that the living arrangements were crowded. For this reason, she wanted to buy home to live in with her boyfriend and their young daughter.

Swain also demonstrated that she understood the arrangement for receiving the payments. She had the following exchange with Peachtree's counsel:

Q. You understand that MetLife is not obligated to split payments amongst you and my client.

A. Yes.

Q. [W]e executed a servicing arrangement. We put that in the order where you're releasing them. And under that order as signed by the Judge, your agreement, they're going to be sending 100 percent of the payment to my client. My client will retain the portion that's been assigned and remit the rest to you through a direct deposit.

A. Yes.

Q. And that's acceptable to you.

10

A. Correct.

On April 6, 2015, the district court signed an "Order Confirming and Reaffirming Final Order Approving Transfer of Structured Settlement Payment Rights." In the order, the court recited,

> Having heard and considered the evidence and the arguments of counsel, the Court confirms and reaffirms its findings and rulings set forth in the Final Order and incorporates all of the findings and rulings set forth in the Final Order herein, as if fully set forth at length, including granting the Application and making the requisite findings under the [Structured Settlement Protection Act].

This appeal followed. MetLife asserts five issues.[4]

## Statutory and Contractual Issues

In its first three issues, MetLife asserts that (1) the "[district] court erroneously rewrote MetLife's contracts with Ms. Swain and others"; (2) "the trial court improperly circumvented the Texas SSPA"; and (3) "the [district] court erroneously imposed a servicing arrangement on MetLife." MetLife's asserts in its fifth issue that the trial court's Final Order violates the SSPA because it contravenes the terms of the minor settlement order signed by a Wisconsin court.

---

[4] We note that the issues contained in the "Issues Presented" section of MetLife's brief do not match exactly the issues identified in the main headings in the body of its brief. Because they are supported by argument, we consider the issues presented in the body of MetLife's brief as the main issues on appeal.

## A.    Standard of Review

MetLife's first three issues implicate matters of contract and statutory construction.  Because they involve questions of law, we review de novo issues involving the construction of a statute or an unambiguous contract.  *Washington Square Fin., LLC v. RSL Funding, LLC*, 418 S.W.3d 761, 767 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *see also J.G. Wentworth Originations, LLC v. Freelon*, 446 S.W.3d 426, 430 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("The trial court's determination that RSL's transfer application does not contravene any applicable statute or court order is a question of law that we review de novo.") (citing *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)).  In construing statutes, we ascertain and give effect to the Texas Legislature's intent as expressed by the language of the statute.  *Freelon*, 446 S.W.3d at 430.  We presume that the legislature intended a just and reasonable result by enacting the statute.  *See* TEX. GOV'T CODE ANN. § 311.021(3) (Vernon 2013).

Questions of contract construction are reviewed similarly to questions of statutory construction.  *Washington Square*, 418 S.W.3d at 767.  Our primary concern in interpreting a contract is to ascertain and to give effect to the intentions of the parties as expressed in the instrument.  *Id.* (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).  We examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract, so

that none will be rendered meaningless. *Id.* We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and we will avoid, when possible, an unreasonable, inequitable, or oppressive construction. *Id.* (citing *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005)).

## B.     Circumventing the SSPA

In its second issue, MetLife asserts that the portion of the district court's Final Order, requiring MetLife to remit the entirety of Swain's monthly periodic payments to Peachtree, circumvents the SSPA.

### 1.  *Structured Settlement Protection Act*

Structured-settlement payment rights cannot be transferred without an agreement among the parties. *RSL-3B-IL, Ltd. v. Prudential Ins. Co. of Am.*, 470 S.W.3d 131, 136 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). "Standing alone, however, those agreements cannot transfer settlement rights in Texas—they are unenforceable unless a Texas trial court has approved the proposed transfer in an order that complies with the SSPA's requirements." *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.004) (Vernon 2011)).

The SSPA requires that the transferee provide to the payee a disclosure statement setting forth the primary financial terms of the completed transaction at

least three days before the payee may sign a transfer agreement contract.[5]  *Freelon*,

446 S.W.3d at 431 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.003 (Vernon

---

[5] Section 141.002 of the SSPA contains the following relevant definitions:

(7) "Interested party" means, with respect to any structured settlement:

(A) the payee;

(B) any beneficiary irrevocably designated under the annuity contract to receive payments following the payee's death;

(C) the annuity issuer;

(D) the structured settlement obligor; and

(E) any other party that has continuing rights or obligations under the structured settlement.

. . . .

(9) "Payee" means an individual who is receiving tax-free payments under a structured settlement and proposes to transfer payment rights under the structured settlement.

. . . .

(18) "Transfer" means any sale, assignment, pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights made by a payee for consideration, except that the term does not include the creation or perfection of a security interest in structured settlement payments rights under a blanket security agreement entered into with an insured depository institution, in the absence of any action to redirect the structured settlement payments to the insured depository institution, or its agent or successor in interest, or to enforce the blanket security interest against the structured settlement payment rights.

(19) "Transferee" means a party acquiring or proposing to acquire structured settlement payment rights through a transfer.

2011)).  After the disclosure statement is delivered and the payee and transferee sign a transfer agreement, the transferee is responsible for filing an application for approval of the proposed transfer.  *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.006(a) (Vernon 2011)).  In other words, to achieve a transfer of structured-settlement payment rights, a factoring company must initiate a proceeding in the trial court by applying for approval of the proposed transfer.  *RSL-3B-IL, Ltd.*, 470 S.W.3d at 136 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.006).

The application must be filed at least 20 days before a hearing for approval of a transfer, and the transferee shall file and serve on all parties copies of the application, transfer agreement, disclosure statement, listing of the payee's dependents and their ages, notices to any interested party, and notices of the hearing and the manner and time by which written responses must be filed with the trial court.  *Freelon*, 446 S.W.3d at 431 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.006(b)(l)–(6)).  "Written responses to the application . . . must be filed on or after the 15th day after the date the transferee's notice is served."  TEX. CIV. PRAC. & REM. CODE ANN. § 141.006(c).

---

. . . .

(21) "Transfer agreement" means the agreement providing for a transfer of structured settlement payment rights.

TEX. CIV. PRAC. & REM. CODE ANN. § 141.002(7), (9), (18), (19), (21) (Vernon 2011).

15

A trial court's order approving a transfer must include the following findings:

(1) the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;

(2) the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the advice in writing; and

(3) the transfer does not contravene any applicable statute or an order of any court or other governmental authority.

TEX. CIV. PRAC. & REM. CODE ANN. § 141.004.

The SSPA identifies the structured-settlement obligor or annuity issuer as an interested party in a proposed transfer of structured-settlement payments. *RSL-3B-IL, Ltd.*, 470 S.W.3d at 136 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.002(7)(C) (Vernon 2011)). "Unlike the factoring company and the structured-settlement payee, it does not have any direct financial interest in the transfer. An annuity issuer does, however, have potential liabilities that could arise in connection with the transfer of a payment obligation, such as making payments to an incorrect or unauthorized payee." *Id.*

We have observed,

The SSPA implicitly recognizes that an annuity issuer would incur an unforeseen increase in transaction costs and responsibilities if structured-settlement transfer agreements required an annuity issuer to make periodic payments to more than one party. The statute [in Section 141.005(4)] protects an annuity issuer from having to divide

16

payments between the payee and any transferee, or between two or more transferees or assignees.

*Id.* at 137.

### 2. *Analysis*

MetLife complains of the provision in the Final Order setting forth what the order refers to as the "Servicing Arrangement." The Servicing Arrangement provision (1) requires MetLife to remit, each month, the entire periodic payment to Peachtree "as Ms. Swain's designated and authorized payment agent for purposes of receiving the Term Payments," (2) permits Peachtree "to retain the portion of each Term Payment that constitutes an Assigned Payment," and (3) orders Peachtree "to pay and remit to Ms. Swain the portion of said Term Payments that constitute the Remaining Swain Monthly Payments."

In its brief, MetLife writes, "Peachtree has conceded that the Trial Court did not have the authority to compel MetLife to directly divide Periodic Payments between Ms. Swain and Peachtree. . . . Accordingly, the sole purpose of imposing the Servicing Arrangement on MetLife was to circumvent the statutory prohibition [of Section 141.005(4)]." MetLife further asserts, "It was error for the Trial Court to force MetLife to do indirectly what it could not force MetLife to do directly."

We begin by reviewing the plain language of Section 141.005(4), which provides, "[N]either the structured settlement obligor nor the annuity issuer may be required to divide any periodic payment between the payee and any transferee or

17

assignee or between two or more transferees or assignees." TEX. CIV. PRAC. &
REM. CODE ANN. § 141.005(4). Here, by ordering the Servicing Arrangement, the
district court rendered an order that complied with the plain language of the statute.
MetLife was not required "to divide any periodic payment between the payee and
any transferee," as prohibited by statute. *See id.* To the contrary, in addition to
ordering the Servicing Arrangement, the district court also ordered that MetLife
was "not being forced or required or ordered to split or divide any structured
settlement/annuity payments amongst Ms. Swain and Peachtree and shall not be
required to do so in the future."

Citing *Fox v. Robison*, 229 S.W. 456, 458 (Tex. 1921), MetLife asserts,
"[T]he Texas Supreme Court specifically prohibited a party from circumventing a
statute's provisions in order to achieve indirectly what the party could not achieve
directly under the statute." Thus, we ask what could Peachtree not achieve, either
directly or indirectly, under Section 141.005(4)? The answer is that Peachtree
could not obtain an order requiring MetLife to split the periodic monthly payments
between Peachtree and Swain. On appeal, MetLife claims that it was required to
indirectly divide the periodic payments through Peachtree, which MetLife asserts
was acting as a servicer of the payments for MetLife.

As we noted in *RSL-3B-IL, Ltd.*, the SSPA implicitly recognizes that
requiring an annuity issuer to divide payments between the payee and transferee or

18

two or more transferees or assignees would result in an unforeseen increase in transaction costs and responsibilities. *RSL-3B-IL, Ltd.*, 470 S.W.3d at 136. We indicated that Section 141.005(4) protects obligors and annuity issuers, such as MetLife, from incurring unforeseen transaction costs and responsibilities because they cannot be required to divide payments. *See id.* In other words, Section 141.005(4) serves the purpose of preventing obligors and annuity issuers from bearing increased transaction costs and responsibilities. *See id.*

Here, the following waiver of liability provisions make clear that Peachtree's acts are not attributable to MetLife and that the Servicing Arrangement does not result in an unforeseen increase in transaction costs and responsibilities to MetLife:

> IT IS FURTHER ORDERED that Metropolitan Life and Metropolitan Insurance shall absolutely, irrevocably, and forever discharge and satisfy their legal and contractual obligation to make the Term Payments (including the Assigned Payments and the Remaining Swain Monthly Payments) by paying and remitting said Term Payments to Peachtree pursuant to this court order and the Servicing Arrangement and by doing so, Metropolitan Life and Metropolitan Insurance are released from, and shall have not have, any current or future liability to Ms. Swain for the Term Payments. By signing and approving this order, Ms. Swain acknowledges, understands, and agrees that [s]he will receive the Remaining Swain Monthly Payments through Peachtree (as her designated payment agent solely for purposes of receiving and distributing the Term Payments pursuant to the Servicing Agent and this Final Order) and that [MetLife] hall not be obligated to make any portion of the Term Payments directly to Ms. Swain; that Ms. Swain shall look solely and exclusively to Peachtree for the Remaining Swain Monthly Payments; and that [MetLife] shall not, following the signing of this Final Order by the Court, have any obligation or liability (contractual or legal) to Ms.

19

Swain relative to the Term Payments, including the Remaining Swain Monthly Payments.

. . . .

IT IS FURTHER ORDERED that pursuant to the Texas Transfer Statute, by making and delivering the Term Payments to [Peachtree] as set forth in the preceding paragraphs, MetLife shall, as to all parties except [Peachtree], be discharged and released from any and all liability for the Term Payments.

We conclude that the district court's Final Order did not require MetLife to do indirectly what it could not be required to do directly; that is, MetLife was not required, directly or indirectly, to divide the payments between Swain and Peachtree. We hold that the order did not circumvent Section 141.005(4) as MetLife claims.

We overrule MetLife's second issue.

C.    **Rewriting Contracts and Contravening Wisconsin Order**

In its first issue, MetLife avers, "By forcing MetLife to send to Peachtree the entire amount of each Periodic Payment (including both the Unassigned Payments and the Assigned Payments), the Final Order rewrote the Governing Contracts among MetLife, Ms. Swain, and others, which required MetLife to send the Periodic Payments to Ms. Swain." Similarly, in its fifth issue, MetLife asserts that the Final Order contravenes the order signed by the Wisconsin court, which approves Swain's structured settlement. MetLife points out that the SSPA requires that, before a transfer of structured-settlement payment right may be approved, the

court must find in its final order that "the transfer does not contravene any applicable statute or an order of any court or other governmental authority." In its brief, MetLife asserts, "[T]he Final Order, by requiring MetLife to pay the Unassigned Payments to Peachtree, contravened the [Wisconsin] Order, which specifically ordered that the annuity payments be made 'to SARA LEE SWAIN' and which specifically approved MetLife as the payor responsible for making such payment."[6]

The Final Order provides that MetLife is "authorized and directed to pay and remit to Peachtree (as Ms. Swain's designated and authorized payment agent for purposes of receiving the Term Payments) 100% of the Term Payments." The order also stated,

> By signing and approving this order, Ms. Swain acknowledges, understands, and agrees that [s]he will receive the Remaining Swain Monthly Payments through Peachtree (as her designated payment agent solely for purposes of receiving and distributing the Term Payments pursuant to the Servicing Agent [sic] and this Final Order) and that [MetLife] shall not be obligated to make any portion of the Term Payments directly to Ms. Swain; that Ms. Swain shall look solely and exclusively to Peachtree for the Remaining Swain Monthly Payments . . . .

[6] We note that neither the contracts cited by MetLife nor the Wisconsin order are contained in the record. MetLife has attached the contracts and the Wisconsin order to its brief. We do not consider documents attached to briefs but not contained in the appellate record. *Samara v. Samara*, 52 S.W.3d 455, 456 n.1 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *Till v. Thomas*, 10 S.W.3d 730, 733 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *see also Save Our Springs All., Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 892 (Tex. App.—Austin 2010, pet. denied). In any event, it appears undisputed that MetLife agreed to pay the periodic monthly payments to Swain.

21

Swain signed the Final Order, indicating on the signature page that she "agreed to and approved" the order "as to form and substance." By doing so, she "acknowledge[d], underst[oo]d, and agree[d]" that she would receive the unassigned portion of the periodic payments through Peachtree, acting as her designated payment agent for purposes of receiving the payments. In addition to acknowledging that Peachtree was her "designated payment agent," Swain also testified that she agreed to permit Peachtree to receive the entirety of the monthly payments and to then remit the unassigned portion to her.

Under Texas law, "[p]ayment to an authorized agent of the obligee constitutes payment to the principal." *Jarvis v. K & E Re One, LLC*, 390 S.W.3d 631, 640 (Tex. App.—Dallas 2012, no pet.) (citing *Cash v. Lebowitz*, 734 S.W.2d 396, 399 (Tex. App.—Dallas 1987, writ ref'd n.r.e.)). Thus, by Peachtree being named as Swain's authorized agent to receive payment, payment to Peachtree constitutes payment to Swain and conforms to the requirement of the contracts, and the Wisconsin order, that MetLife pay Swain the periodic payments. *See id.* On appeal, however, MetLife asserts that Peachtree was not Swain's agent for purposes on receiving the payments.

"An 'agent' is one who is authorized by a person or entity to transact business or manage some affair for the person or entity." *Paragon Indus. Applications, Inc. v. Stan Excavating, LLC*, 432 S.W.3d 542, 548 (Tex. App.—

22

Texarkana 2014, no pet.). "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Actual express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal. *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Here, Swain expressly and directly authorized Peachtree to be her designated agent for purposes of receiving the entire periodic payment.[7] As discussed, Swain signed—approving as to form and substance—the Final Order which stated, that "By signing and approving this order, Ms. Swain acknowledges, understands, and agrees that [s]he will receive the Remaining Swain Monthly Payments through Peachtree []as her designated payment agent solely for purposes of receiving and distributing the Term Payments . . . ."

In addition, Swain provided the following testimony during her examination by Peachtree's counsel:

---

[7]   This case is unusual because most cases involving the issue of whether one party is another's agent involve a determination of agency for purposes of holding a party liable for past conduct of the agent. Here, the issue is whether Peachtree is Swain's authorized payment agent for purposes of going forward with the Servicing Arrangement.

Q. You understand that MetLife is not obligated to split payments amongst you and my client.

A. Yes.

Q. [W]e executed a servicing arrangement. We put that in the order where you're releasing them. And under that order as signed by the Judge, your agreement, they're going to be sending 100 percent of the payment to my client. My client will retain the portion that's been assigned and remit the rest to you through a direct deposit.

A. Yes.

Q. And that's acceptable to you.

A. Correct.

We conclude that Peachtree is Swain's authorized agent for purposes of receiving the periodic payments from MetLife. As a result, payment of the periodic payments to Peachtree would constitute payment to Swain.[8] *See Jarvis*, 390 S.W.3d at 639–40; *Cash,* 734 S.W.2d at 399. Thus, the Final Order does not rewrite the contracts or contravene the Wisconsin order, which require MetLife to pay the structured-settlement payments to Swain.

We note that MetLife points to *In re Rains*, 473 S.W.3d 461 (Tex. App.—Amarillo 2015, no pet.) to support its position that the Final Order rewrote the settlement contracts because the order requires MetLife to remit the entire periodic

---

[8] We note that the Final Order provides that "the Remaining Swain Monthly Payments shall remain the property of Ms. Swain, even though said payments are to be paid and remitted to Peachtree pursuant to the Servicing Arrangement and this Final Order." This further indicates that, even though the funds are being sent to Peachtree, MetLife is paying the funds to Swain.

payments to Peachtree. In *Rains*, the court reversed the trial court's final order which had approved the transfer of Rains's structured settlement payments to a factoring company in exchange for a lump-sum payment. *Id.* at 470. The court held that the order had impermissibly modified the annuity contract between the parties because it had ordered the annuity company, Metropolitan Life Insurance Company, to pay the entirety of the periodic structured settlement payments to the factoring company, which would then retain the assigned funds and remit the remaining unassigned funds to Rains. *See id.* at 469–70. Despite the similarities between *Rains* and this case, there is an important distinction. *Rains* does not discuss or determine the issue of whether the factoring company had been designated to be Rains's agent for purposes of receiving the funds. Thus, we find *Rains* to be inapposite in our determination of MetLife's first issue.

We overrule MetLife's first and fourth issues.

**D.   Improperly Imposing a Servicing Arrangement on MetLife**

In its third issue, which includes a number of sub–issues, MetLife contends that the district court "erroneously imposed a servicing arrangement on MetLife." MetLife asserts that the Servicing Arrangement improperly creates an unwanted, long-term business relationship between MetLife and Peachtree. More precisely, MetLife avers that Servicing Arrangement creates either an agency or contractual relationship between it and Peachtree under which MetLife is forced to rely on

25

Peachtree to perform MetLife's obligation to remit the unassigned payments to Swain. MetLife asserts that, as a result, "the Servicing Arrangement is improper because it violates MetLife's liberty to enter into (or not enter into) contractual and business relationships" of its choice.

We disagree that, when read in the context of the Final Order, the Servicing Arrangement creates either a contractual relationship or an agency relationship between MetLife and Peachtree. As discussed, the Final Order provides, and Swain has expressly agreed, that Peachtree is her authorized agent for purposes of receiving the unassigned periodic payments. Once Peachtree—as Swain's authorized payment agent—receives payment from MetLife, payment of the unassigned payments has effectively been made to Swain by MetLife. *See Jarvis*, 390 S.W.3d at 639–40; *Cash*, 734 S.W.2d at 399. This is true even if Peachtree fails to remit the unassigned payments to Swain after MetLife has paid the funds to Peachtree. *See Jarvis*, 390 S.W.3d at 639–40.

Texas courts have held that, if an agent misappropriates payments intended for its principal, it is the principal that bears the loss because, after the payment has been made to the agent, the payment is deemed to have been made to the principal. *See Jarvis*, 390 S.W.3d at 640; *see also MacMichael LLC v. Packaging Corp. of Am.*, No. 05–08–00561–CV, 2009 WL 1959247, at *3 (Tex. App.—Dallas July 9, 2009, no pet.) (mem. op.) ("When payment is made to an authorized agent, the

26

default of an agent is the responsibility of the principal."); *Cash*, 734 S.W.2d at 399 (holding that any damage resulting from agent's faithlessness and chicanery must be borne by principal). Thus, under Texas law, MetLife's obligation to Swain, with regard to remittance of the unassigned payments, is fulfilled once MetLife forwards payment to Peachtree, even if Peachtree fails to remit the unassigned payments to Swain. *See Jarvis*, 390 S.W.3d at 639–40. The waiver of liability provision in the Final Order conforms to this precept:

> MetLife shall absolutely, irrevocably, and forever discharge and satisfy their legal and contractual obligation to make the Term Payments (including the Assigned Payments and the Remaining Swain Monthly Payments) by paying and remitting said Term Payments to Peachtree pursuant to this court order and the Servicing Arrangement and by doing so, Metropolitan Life and Metropolitan Insurance are released from, and shall have not have, any current or future liability to Ms. Swain for the Term Payments.

In short, pursuant to the Servicing Arrangement, Peachtree is Swain's agent for receiving the unassigned payments. The Servicing Arrangement does not create an agency or contractual relationship between MetLife and Peachtree with regard to remittance of the unassigned payments to Swain.

MetLife next complains that it was error for the district court to order the Servicing Arrangement because Peachtree did not request that relief in its application filed with the district court. MetLife also asserts that Peachtree did not prove it was entitled to the Servicing Arrangement under the SSPA.

27

We agree with Peachtree that, in conjunction with approving a requested transfer of structured-settlement rights, the SSPA contemplates that a court will render orders to effectuate the transfer. Section 141.004 provides, "[N]o structured settlement obligor or annuity issuer *shall be required to make any payment* directly or indirectly to any transferee . . . unless the transfer has been approved . . . in a final court order . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 141.004 (emphasis added). Section 141.005(2)(B) provides that "[f]ollowing a transfer of structured settlement payment rights . . . the transferee shall be liable to the structured settlement obligor and the annuity issuer[] for any other liabilities or costs, including reasonable costs and attorney's fees, arising from compliance by the parties *with the order of the court . . . ." Id.* § 141.005(2)(B) (emphasis added). And, as discussed, Section 141.005(4) mandates that "neither the structured settlement obligor nor the annuity issuer *may be required* to divide any periodic payment between the payee and any transferee or assignee or between two or more transferees or assignees." *Id.* § 141.005(4) (emphasis added). Each of these provisions appears to contemplate that, when approving the transfer, the court will issue orders governing the transfer of the structured-settlement funds, which necessarily includes the manner in which the obligor and annuity issuer will remit the funds. *See id.*

We have previously indicated that nothing in the SSPA prohibits payees, such as Swain, from transferring only a portion of her structured-settlement payments or from entering into a series of transactions in which she sells additional portions of her settlement payments. *See Freelon*, 446 S.W.3d at 433. In fact, we stated that the SSPA appears to anticipate such transfers. *See id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 141.005(5)). We also note that nothing in the SSPA prohibits the district court from giving effect to Swain's request for Peachtree to act as her authorized payment agent to receive the unassigned payments. However, the SSPA does prohibit the district court from requiring MetLife to divide the periodic structured settlement payments between Peachtree and Swain. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 141.005(4). Considering the language of the SSPA and balancing all of these competing interests, we conclude that the district court was within its authority to order the Servicing Arrangement in the Final Order. By so doing, the court effectuated the approved transfer by permitting Swain to transfer a portion of her settlement payment rights while also complying with the statutory prohibition against requiring MetLife to divide the payments.

With respect to MetLife's assertion that district court should not have ordered the Serving Arrangement because it was not requested in Peachtree's application, we note that the transfer application made clear that only a portion of Swain's periodic payments were subject to the Transfer Agreement. In response to

29

the application, MetLife objected to the transfer, asserting that, pursuant to the SSPA, it could not be required to divide the periodic payments between Peachtree and Swain. It was MetLife who first raised the prospect of a Servicing Arrangement in its response, arguing against the imposition of such an arrangement. We note that, while Section 141.005(4) provides that an obligor or annuity issuer cannot be required to divide payments, nothing prohibits them from agreeing to split payments when the payee has transferred only part of her structured settlement rights. *See id.* Here, the necessity of the Servicing Arrangement only became apparent after MetLife objected in its response to being required to split the payments. After that time, the parties were fully engaged in litigating the issue. MetLife not only briefed the issue in the trial court but also argued strenuously against the imposition of the Servicing Arrangement at both the February 2, 2015 and April 6, 2015 hearings.

Lastly, MetLife asserts in its brief that the trial court erred in ordering the Servicing Arrangement because the arrangement imposes on MetLife "additional future burdens, risks, liabilities, and entanglements." MetLife first claims that the arrangement leaves it vulnerable to liability in the event that Peachtree does not remit the unassigned payments to Swain. However, as discussed, Swain's agreement to appoint Peachtree as her agent to receive the unassigned payments,

and the order's waiver of liability provisions, adequately addresses MetLife's potential liability to Swain.

MetLife further identifies a number of possible scenarios under which the Servicing Arrangement might render it vulnerable to future litigation. For example, MetLife points out that, if Peachtree files for bankruptcy or if Swain is subject to a garnishment order, such scenarios "would almost certainly embroil MetLife in costly and distracting litigation." However, the record does not show that any of the scenarios proposed by MetLife are actual events or are in any way imminent. While the scenarios proposed by MetLife are possible, we cannot hold that the district court erred in rendering its order based on speculation.

We hold that MetLife has not shown that the district court erred by ordering the Servicing Arrangement. We overrule MetLife's third issue.

## Best-Interest Finding

For the transfer of structured settlement payment rights to be effective, the SSPA requires that the transfer be approved "in advance in a final court order based on express findings by the court that . . . the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents . . . ." *Id.* § 141.004(1). Here, the district court found in the Final Order that "[t]he transfer is in the best interest of [Swain], taking into account the welfare and support of [her] dependent." MetLife challenges this finding in its

31

fifth issue, asserting, "The [district] court erred in finding that the transfer was in Ms. Swain's best interest." MetLife claims that sufficient evidence was not presented to support the district court's best-interest determination.

## A.    Standard of Review

In *Rains*, the court also determined whether the trial court had erred when it had found that the transfer of Rains's structured settlement payment rights was in her best interest. *See Rains*, 473 S.W.3d at 463. There, the court recognized, "Whether the best interest of a party was met tends to be an exercise implicating the trial court's discretion." *Rains*, 473 S.W.3d at 468 (citing *Webre v. Black*, 458 S.W.3d 113, 116–17 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (applying the abuse-of-discretion-standard to determine whether settlement was in best interest of a ward)). We agree. Accordingly, we review the district court's best-interest finding under an abuse-of-discretion standard.

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). In addition, "to legitimately exercise [its] discretion, a trial court must have sufficient evidence before it to support the manner in which it exercised that discretion." *Rains*, 473 S.W.3d at 469 (citing *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex.

App.—San Antonio 2007, no pet.) (determining whether sufficient evidence supports decision is part of deciding whether trial court abused its discretion)).

## B.      Guidance for Determining Best Interest

Other than "taking into account the welfare and support of the payee's dependents," the SSPA provides no guidance regarding what factors to consider in determining whether the transfer is in the payee's best interest. *See id.* In *Rains*, the court suggested that the following information would assist a court in making the best-interest determination:

> 1) the financial resources and income available to the payee and her dependents other than the structured settlement payments, 2) the extent or amount of both the payee's debt and expenses and those of her family and their ability to pay the same, 3) the assets (both real and personal) available to the payee and her family, 4) the future yet reasonably foreseeable liabilities of the payee and her family, 5) the future yet reasonably foreseeable domestic, economic, physical, medical, and educational needs of the payee and her dependents, 6) the payee's current need for and intended use of the lump sum to be received, 7) the number of dependents maintained by the payee and their age, and 8) the percentage of payments being assigned.

*Rains*, 473 S.W.3d at 464.

The *Rains* court further stated,

> [The SSPA] was enacted to shield against possible exploitation and abuse by factors also suggests other indicia meriting consideration. Included among them would be such things as 1) the payee's age, education and acumen, 2) the payee's business or financial acumen, 3) the payee's ability to secure independent and informative financial advice, 4) the payee's attempt to secure independent and informative financial advice if she otherwise lacked financial acumen, 5) the value being received in exchange for the value being relinquished by the

payee, 6) the payee's effort, if any, to maximize her return, 7) the payee's search for and communication with other factors, 8) the presence of other factors or entities willing to strike a bargain and the value they would give in exchange for the value received, 9) financial alternatives available to the payee, if any, and 10) the financial capability of the factor to perform depending upon the manner in which the assignment is structured.

*Id.*

The court recognized "the foregoing indicia" are not exclusive. *Id.* "Nor is any particular indicia determinative." *Id.* The court explained that the indicia "serve as a means of assisting the trial court in arriving at an informed decision." *Id.* The court further recognized, "Simply put, there is no bright line, and the outcome in each case depends upon the circumstances involved in that case." *Id.* Most importantly, "[i]rrespective of what considerations the trial court may weigh, the record must illustrate that it did more than simply 'rubber stamp' whatever bargain the factor may have struck with the payee." *Id.* at 465.

## C. Analysis

We now turn to the evidence in this case to determine whether the district court had sufficient evidence before it to exercise its discretion to find that the transfer was "in the best interest of [Swain], taking into account the welfare and support of [her] dependent." TEX. CIV. PRAC. & REM. CODE ANN. § 141.004(1). The transfer was initially approved by the district court in the Final Order,

following the February 2, 2015 hearing. Swain and counsel for MetLife and Peachtree appeared at that hearing.

Although she did not testify, Swain spoke with the district court at the hearing. The court asked Swain if she had "shopped around" to other companies to determine whether she could strike a better deal. Swain responded that she had and stated that "this deal was the best one that I found." Swain also told the district court that her grandfather, who owns an accounting business, had been advising her with respect to the transaction with Peachtree.

Peachtree offered two exhibits into evidence at the hearing. The first exhibit was a schedule, showing the full amount of the monthly periodic payments due over the 132-month period that Peachtree would be receiving its assigned portion of the periodic payments. The schedule also showed the amount that would be transferred to Peachtree during that time period, and the remaining unassigned portion that Swain would receive. The schedule was broken into eleven separate annual periods. The first period listed was May 2015–April 2016. For that period, the full amount of each monthly settlement payment was $1,692.54. Out of that, Peachtree would receive its assigned payment of $495.00, leaving Swain to receive the remaining payment of $1,197.54 each month. The schedule showed that, for the last period covered by the Transfer Agreement, May 2025–April 2026, the full amount of each monthly settlement payment was $2,274.63. Peachtree's monthly

assigned portion for that period was $665.24, leaving Swain to receive $1,609.39 each month.

The second exhibit was an amortization schedule. It showed the "effective annual rate" charged by Peachtree for the transfer was 7.822%.

After Peachtree filed its "Motion for New Trial and/or to Supplement the Record and Present Additional Testimony," the district court held a second hearing regarding the transfer on April 6, 2015. Peachtree called Swain to testify at the hearing. Swain first confirmed for the district court that what she had told the court at the February 2 hearing was "true and correct."

Swain then testified as to the following pertinent facts:

- Swain was 29 years old.

- Swain and her boyfriend, William, are in a committed relationship.

- She and William have an 18-month old daughter.

- Swain is employed full-time at Brenner's Steak house, netting $700 per week.

- William is self-employed as a contractor.

- Swain graduated from high school and has completed "some college."

- She received a structured settlement as a result of her mother's death in October 1999.

- The lawsuit arising from her mother's death was filed in Wisconsin and settled on her behalf by her maternal grandparents.

- After her mother's death, Swain was raised by her maternal grandparents.

- Under the terms of the structured settlement, Swain is will receive monthly payments of $1,416 beginning in May of 2010 and continuing for the rest of her life with 40 years guaranteed, increasing 3% percent per year.

- Swain understood that she had "entered into a contract to transfer and assign [to Peachtree] a portion of [her] monthly payments in the amount of $495 per month beginning in May of 2015 [and] running through April 2026."

- The total amount of the payments that Swain has assigned to Peachtree is a little over $76,000.

- In return, Peachtree agreed to pay Swain a lump sum of $49,716.

- Swain had already received the $49,716 from Peachtree at the time of the hearing.

- Swain needed the $49,716 to pay back her grandfather $9,000 she had borrowed from him to buy a car.

- Swain planned to use the remaining $40,000 as a down payment on a house.

- Swain had a contract on a house in Katy, Texas. She was closing on the house on either the day of the hearing or the next day.

- Swain, her daughter, and Swain's boyfriend would live in the home.

- Swain and her family had been living with relatives, who had eight children. The living situation was "a little crowded."

- Swain's grandfather has owned an accounting business in Wisconsin for 20 years.

- Swain consulted her grandfather regarding the transaction with Peachtree. He advised Swain regarding the transaction and assisted her in negotiating it.

- Swain confirmed that she "wanted to sell a portion of payments and keep about $1,100 per month coming in."

- Swain was knowledgeable about the varying amounts of the monthly settlement payments that she had retained and the amounts that she had assigned to Peachtree over the course of the 132-month payment period.

- Swain knew that MetLife was not required to split the payments and that the Servicing Arrangement was part of the court's order.

- It was acceptable to Swain that MetLife would "be sending 100 percent of the payment" to Peachtree and that Peachtree would then "retain the portion that's been assigned [to it] and remit the rest to [Swain] through a direct deposit."

MetLife's counsel also cross-examined Swain. On cross-examination, Swain testified as to the following:

- Swain did not know what the "discount rate" was for the transaction, but she stated that her grandfather knew what that was.

- Swain knew that she was paying approximately $76,000 and receiving $49,000.

- Swain confirmed that she had sought other loan alternatives than Peachtree. Swain had contacted RSL Funding regarding a loan and had learned that RSL would charge her a much higher rate than Peachtree.

At the conclusion of the hearing, based on the evidence presented at both hearings, the district court signed an "Order Confirming and Reaffirming Final Order Approving Transfer of Structured Settlement Payment Rights."

On appeal, MetLife asserts that the evidence was not sufficient to support the district court's exercise of its discretion to support the best-interest determination. MetLife avers that Peachtree failed to offer evidence regarding a number of the factors listed in *Rains*. Specifically, MetLife criticizes Peachtree for not offering evidence as to the following:

> (1) Ms. Rains' assets and other financial resources (other than her salary and the Periodic Payments); (2) the amount of her debt and expenses and her ability to pay them; (3) her foreseeable liabilities; (4) her and her daughter's foreseeable domestic, economic, physical, medical, and educational needs; (5) the details regarding her current need for and intended use of the lump sum to be received; (6) whether she attempted to secure independent professional financial advice; (7) her efforts, if any, to maximize her return from Peachtree; (8) her search for and communications with other factors (other than RSL); (9) financial alternatives available to Ms. Swain, including bank loans, home loans, car loans, and other sources of financing; and (10) the financial capability of Peachtree to perform for the next 11 years.

MetLife is also critical of Swain's need to repay the loan to her grandfather and of the lack of evidence regarding the details of that loan. MetLife also questions whether Swain should have had obtained advice independent of her grandfather, given that a portion of the money would be used to repay him. In addition, MetLife further criticized the proffered evidence because it did not include information regarding the financial details of the Swain's home purchase. MetLife further assails the evidence, asserting that Peachtree did not show how the 7.822 percent interest rate compares "to the rates in other Peachtree transactions and the industry generally."

39

We note that the *Rains* court recognized that no particular factor is determinative; rather, the factors, along with other pertinent information, are intended to assist the court in making an informed best-interest determination. *See Rains*, 473 S.W.3d at 464. "[T]he outcome in each case depends upon the circumstances involved in that case." *Id.* Here, the circumstances of the case support the district court's best-interest determination.

The most pertinent evidence showed that, even after Peachtree receives its assigned payment, with her wages and retained structured settlement payment, Swain will have a net income of nearly $4,000 a month. Swain will use a majority of the $49,716 to purchase a house for her family, which will provide a home for her 18-month-old daughter. In addition, Swain is knowledgeable regarding how the transfer will affect her monthly income and regarding how much the transfer is costing her. Regarding whether Swain should have sought advice independent of her grandfather, the evidence showed that her grandfather had owned his own accounting firm for 20 years and had been a surrogate parent to Swain, raising her since the death of his daughter, Swain's mother. Lastly, Swain indicated that she had "shopped around" and had found that Peachtree was offering her the lowest rate.

Based on the record, we conclude that sufficient evidence was presented to support the district court's exercise of its discretion in finding that the transfer of a

portion of Swain's settlement funds to Peachtree was in her best interest. We hold that MetLife has not shown that the district court abused its discretion in making its best-interest finding.

We overrule MetLife's fifth issue.

## Conclusion

We affirm the district court's April 6, 2015 order, which approves the transfer of Swain's structured-settlement payments.[9]

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

---

[9] The Final Order signed on February 2, 2015 merged into the April 6, 2015 "Order Confirming and Reaffirming Final Order Approving Transfer of Structured Settlement Payment Rights" to form the final order in this case.